UNITED STATES of America,
Plaintiff-Appellant,

v.

MARENGO COUNTY COMMISSION, et al., Defendants-Appellees.

No. 81–7796.

United States Court of Appeals,
Eleventh Circuit.

May 14, 1984.

---

Joan A. Magagna, Asst. Atty. Gen., U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., Thomas H. Figures, Asst. U.S. Atty., Mobile, Ala., for U.S.

Hugh A. Lloyd, Demopolis, Ala., for Marengo County Bd. of Education.

Cartledge W. Blackwell, Jr., Selma, Ala., for Marengo County et al.

Before TJOFLAT and FAY, Circuit Judges, and WISDOM[*], Senior Circuit Judge.

WISDOM, Senior Circuit Judge:

In 1979 the district court held that the at-large system for electing the Marengo County, Alabama county commission and school board did not violate the Fourteenth and Fifteenth Amendments; the Civil Rights Act of 1870, as amended, 42 U.S.C. § 1971(a) (1976); and section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 (1976). *Clark v. Marengo County*, 1979, S.D.Ala., 469 F.Supp. 1150. Since that time, we have remanded this case once, and the Supreme Court has issued two decisions affecting the standard of proof in constitutional discrimination cases. *Rogers v. Lodge*, 1982, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012; *City of Mobile v. Bolden*, 1980, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47. Furthermore, in 1982 Congress amended section 2 of the Voting Rights Act to restore the legal standard that governed voter discrimination decisions before the Supreme Court decided *Mobile v. Bolden*.[1] We now hold that the 1982 amendment to section 2 applies to this case; that amended section 2 is a constitutional exercise of congressional enforcement power under the Fourteenth and Fifteenth Amendments; and that the district court was clearly erroneous in holding that Marengo County's at-large system had no discriminatory results as of the time of trial. We remand this case to the district court to allow the parties a limited opportunity to update the record and, in the event that the court finds a continuing violation of the Voting Rights Act, to allow the court to devise an appropriate remedy.

I.

Marengo County is a sparsely populated rural county covering 978 square miles in west central Alabama. Its 1950 population of 29,494 had decreased to 27,098 in 1960 and to 23,819 in 1970. Blacks comprised 69% of the population in 1950, 62.1% in 1960, and 55.2% in 1970. The percentage of blacks in the voting age population has likewise declined over the years: from 56.1% in 1960 to 50.8% in 1970. The parties stipulated that at the time of trial 16,000 persons were qualified to vote, of whom 44 percent were black. Blacks have always constituted a minority of registered voters.[2] There are great social and economic

---

[*] Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. "In sum, prior to the Supreme Court's decision in *Bolden,* it was generally assumed that section 2 covered voting laws and practices having a racially discriminatory effect. That view was grounded in the legislative history of the Voting Rights Act, both in 1965 and 1970, as well as analysis in the lower courts.... The *Bolden* decision dealt minority voters a severe blow. It repudiated the legal standard under which minorities had successfully overcome voting barriers denying them equal access to the political process. Congress, in amending section 2 of the Voting Rights Act, has acted to overrule the *Bolden*

plurality's requirement that discriminatory intent be proved to establish a violation. The new section 2 enacts a standard which focuses on the *results* and *consequences* of challenged electoral practices rather than the motivation behind them...."

Parker, *The "Results" Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L.Rev. 715, 729, 764 (1983). *See also* Boyd and Markman, *The 1982 Amendments to the Voting Rights Act: A Legislative History,* 40 Wash. & Lee L.Rev. 1347 (1983).

2. The population figures are:

| Year | Total Population | White | Percent | Black | Percent |
|------|------------------|-------|---------|-------|---------|
| 1950 | 29,494 | 9,018 | 30.6 | 20,473 | 69.4 |
| 1960 | 27,098 | 10,270 | 37.9 | 16,828 | 62.1 |

disparities between blacks and whites.[3]

The County Commission (formerly the Board of Revenue) and the Board of Education have five members each.[4] Before 1955 each body had a president, elected at-large, and four members elected from districts. In 1955 the state legislature provided that all members of both bodies would be elect-

| | | | | | |
|---|---|---|---|---|---|
| 1970 | 23,819 | 10,662 | 44.8 | 13,157 | 55.2 |
| 1980 | 25,047 | 11,663 | 46.6 | 13,346 | 53.2 |

For voting age population, the figures are:

| | | | | | |
|---|---|---|---|---|---|
| 1960 | 13,895 | 6,104 | 43.9 | 7,791 | 56.1 |
| 1970 | 14,113 | 6,949 | 49.2 | 7,164 | 50.8 |
| 1980 | 16,534 | 8,460 | 51.2 | 8,045 | 48.7 |

The 1980 figures were not available to the trial court when this case was first tried in 1978–79. *See* note 50.

The registration data are as follows:

| Year | Total | White | Percent | Black | Percent |
|---|---|---|---|---|---|
| 1970 | 14,630 | 8,058 | 56.1 | 6,302 | 43.9 |
| 1978 | 18,821 | 10,856 | 57.7 | 7,965 | 42.3 |

These figures show more persons registered to vote than are of voting age; voters who have moved or died are often *not purged from the* rolls. Transcript 1069–72, 1202–04.

3. The district court described the socioeconomic plight of blacks in Marengo County:

"The 1970 Census figures reveal that 744 of the 11,861 persons of 25 years of age and older had never attended school and that 1,652 of that number had completed only four years of education or less, establishing that 20.2% of the total 1970 population aged 25 years or older had either never attended school or had not completed more than four years of formal education. The same census figures reveal that in 1970 there were 5,905 black persons in Marengo County aged 25 years or older, that 690 of these had never attended school, and that 1486 of these had attended school for four years or less. Thus, the 36.9% of the black population over 25 years of age either never attending school or completing four years or less greatly exceeds the county-wide percentage of 20.2%. The figures further reveal that of the 2,244 Marengo County families who were below the poverty level in 1970, 1,841 (82%) were black, and that while the median income for all families in 1970 was $4,909.00 with a mean income of $6,478.00, the black family's median income was $2,456.00 and its mean income was $3,175.00. *General Social and Economic Characteristics, Alabama,* Tables 124 & 128, U.S. Department of Commerce Bureau of the Census (1970). The housing figures from the 1970 Census depict a similar pattern of black poverty. 3,045 (40%) of the 7,341 housing units in Marengo County in 1970 lacked some

or all plumbing facilities, and 2,440 (71%) of the 3,357 housing units with black heads of household lacked some or all of such facilities. *General Housing Characteristics, Alabama,* pp. 2–74, U.S. Department of Commerce Bureau of the Census (1970). According to a 1976 survey, 2,824 (36%) of the 7,990 housing units in Marengo County were rated "substandard." State Housing Plan (June 1976) of the Alabama Development Office (Gov. Exhibit 47). Finally, Census figures reveal that the 1970 per capita income in Marengo County was $1,639.00, while for black persons it was only $722.00 (1970 Census, pp. 2–378 & 2–402)."

469 F.Supp. at 1155. These disparities are even starker when the statistics for blacks are compared with those for non-blacks rather than with overall averages. For example, while 36.9% (2,176 of 5,905) of blacks aged 25 and older had less than four years of education in 1970, this was true for only 3.7% (220 of 5,956) of nonblacks. *See* Government Exhibit No. 47, stipulations 8–9.

ed at-large, with the requirement that one member live in each of the four existing districts.[5] In 1966 the legislature provided for staggered four-year terms.[6]

Before 1965 no black ran for any office in Marengo County. Between 1966 and 1978 there were 73 county-wide elections in

4. The Board of Revenue was created in 1923, replacing the Court of County Commissioners. Act of Sept. 19, 1923, No. 311, 1923 Local Acts of Alabama 188. The statute provided for four-year terms, and stated, "The President of the Board of Revenue shall be elected by the qualified voters of the entire County, and the member of the Board of Revenue from each District shall be elected by the qualified voters of such district." *Id.* § 2, 1923 Local Acts of Alabama at 189. In 1935, the School Board was organized along the same lines, except that the president and members were elected for six-year terms. Act of July 8, 1935, No. 183, §§ 1–4, 1935 Ala. Acts 106, 106–07.

5. Act of February 17, 1955, No. 17, 1955 Ala.Acts 45 (Board of Revenue); Act of July 29, 1955, No. 184, 1955 Ala.Acts 458 (Board of Education). The 1955 act also adopted four-year terms for the Board of Education. *Id.* §§ 3–4, 1955 Ala.Acts at 459.

6. Act of August 16, 1966, No. 44, 1966 Ala.Acts 67 (Board of Revenue); Act of August 16, 1966, No. 45, 1966 Ala.Acts 68 (Board of Education).

which blacks ran against whites.[7] One black was elected County Coroner in 1978 by winning the Democratic primary by a margin of 3,719 to 3,617 over a white candidate. Another black was appointed to the school board.[8]

On August 15, 1977 a group of blacks filed a class action alleging that Marengo County's at-large system for electing the county commission and school board unlawfully diluted the voting rights of blacks. One year later, the United States filed suit under the Voting Rights Act.[9] The court tried the case on October 23–25, 1978 and January 4, 1979. On April 23, 1979 the district court issued an opinion and entered judgment for defendants. The court concluded that the plaintiffs had not proved that the at-large system was being maintained with a discriminatory purpose. 469 F.Supp. at 1180.

The United States appealed to the Fifth Circuit. On April 22, 1980, the United States Supreme Court decided *City of Mobile v. Bolden,* 1980, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47. *Mobile v. Bolden* held that in vote dilution cases discriminatory intent must be shown to establish a constitutional violation, and it raised doubts about the methodology used by the Fifth Circuit in vote dilution cases. This Court accordingly remanded the case to the district court "for further proceedings, including the presentation of such additional evidence [as] is appropriate, in light of [*Mobile v. Bolden* ]". *United States v. Marengo County Commission,* No. 79–2525 (5 Cir. Aug. 6, 1980), Record 448.

On May 20, 1981, the Fifth Circuit decided *Lodge v. Buxton,* 5 Cir.1981, 639 F.2d 1358. *Lodge* held that *Mobile v. Bolden* does not require direct evidence of discriminatory intent but stated, "An essential element of a *prima facie* case [of unconstitutional vote dilution] is proof of unresponsiveness by the public body in question to the group claiming injury." 639 F.2d at 1375. On July 30, 1981, the district court in the present case again ordered judgment for defendants on the ground that the plaintiffs had not established unresponsiveness. The court rejected the United States' offer to present additional evidence, including evidence concerning the reasons for the adoption of at-large elections in Marengo County, because it concluded that this evidence "would add nothing" to show unresponsiveness. Record 499–501.

 The United States again appealed, and we granted its motion to hold this appeal in abeyance pending review of *Lodge v. Buxton* (sub nom. *Rogers v. Lodge* ) by the United States Supreme Court. On July 1, 1982, the Supreme Court affirmed the result in *Lodge,* but held that unresponsiveness is not an essential element of a claim of unconstitutional vote dilution. Instead, the court held that "unresponsiveness is an important element but only one of a number of circumstances a court should consider in determining whether discriminatory purpose may be inferred". *Rogers v. Lodge,* 458 U.S. at 625 n. 9, 102 S.Ct. at 3280 n. 9.[10]

The 1982 amendment to section 2 of the Voting Rights Act became effective on

---

**7.** The record is not clear as to how many black candidates actually ran for county office during this period. Some of the 73 county-wide elections identified were elections for state or national offices; moreover, a single candidacy might be counted several times if there were multiple elections (e.g. runoffs) for the same office.

**8.** Both were apparently reelected without opposition after this case was tried. Brief for the Appellees at 25.

**9.** The complaint alleges that the at-large election systems for the County Commission and Board

of Education violate the Fourteenth and Fifteenth Amendments and 42 U.S.C. §§ 1971(a) and 1973. Jurisdiction was predicated on 28 U.S.C. §§ 1345 and 2201 and 42 U.S.C. §§ 1971(d) and 1973j(f).

**10.** In the light of *Rogers v. Lodge* it is apparent that the district court's rulings on intent must be vacated. Unresponsiveness is not the essential factor in showing intent that the district court held it to be. Furthermore, the record demonstrates significant unresponsiveness to black political and functional needs on the part of the School Board and the Board of Registrars. *See* part VB of this opinion. And the district court

June 29, 1982. Pub.L. No. 97–205, sec. 6, 96 Stat. 131, 135. Congress redefined the scope of section 2 of the Act to forbid not only those voting practices directly prohibited by the Fifteenth Amendment but also any practice "imposed or applied ... in a manner which *results* in a denial or abridgement of the right ... to vote on account of race or color ...." 42 U.S.C.A. § 1973(a) (West Supp.1983) (emphasis added). *See* S.Rep. No. 417, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 177 [1982 Senate Report]. The United States urges us to apply the amended statute to the existing record and hold as a matter of law that Marengo County's at-large system has a discriminatory "result". In response, the defendants argue that the 1982 amendment does not or should not apply to this litigation; that section 2 does not apply to vote dilution claims; that the 1982 amendment is unconstitutional; and that the findings of the district court are not clearly erroneous.

## II.

"[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 1974, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476, 488. This principle goes back as far as *United States v. Schooner Peggy,* 1801, 5

U.S. (1 Cranch) 103, 2 L.Ed. 49, in which Chief Justice Marshall stated,

"It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns ... the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside."

5 U.S. (1 Cranch) at 110. The defendants argue that "manifest injustice" would be done if the amended version of section 2 were applied here. We find, however, that the legislative history of the amendment, and the vital public interest in insuring effective participation in the political process for every citizen, mandate our application of the law in effect now.

█ In general, it is unnecessary to find affirmative support in a statute or its legislative history for applying it to pending cases. A statute will be assumed to apply to cases pending at the time of its passage unless there is a "clear indication" that it is *not* to apply. *Bradley,* 416 U.S. at 712–716, 94 S.Ct. at 2016–2018. Here there is certainly no such indication in either the statute or its legislative history. On the contrary, the available evidence suggests that Congress expected the amendment to govern a case such as the one now before

---

erred when it held "that since the election procedures in question were enacted in 1923 and 1935 when blacks had been effectively disenfranchised, there can be no allegation that the at-large schemes were racially motivated in their enactment". 469 F.Supp. at 1172. The at-large system was in fact enacted in 1955, a year after *Brown* I. *Brown v. Board of Education,* 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. The history of discriminatory voting practices is far too complex for any court to conclude that a statute was not enacted with discriminatory intent simply because blacks could not vote when the statute was adopted. In *NAACP v. Gadsden County School Board,* 11 Cir.1982, 691 F.2d 978, 982, a panel of this Court found clearly erroneous a district court's conclusion that a 1947 change to at-large elections in Florida had no discriminatory purpose. The

at-large system used in Mobile was adopted in 1911, when blacks were disenfranchised, but after a painstaking and scholarly analysis of the history of Mobile the district court concluded, and the Supreme Court affirmed, that the at-large system was originally conceived as part of a comprehensive scheme, devised after Reconstruction, to disenfranchise blacks. *See Bolden v. City of Mobile,* 1982, S.D.Ala., 542 F.Supp. 1050; *Brown v. Board of School Commissioners,* 1982, S.D.Ala., 542 F.Supp. 1078, *aff'd,* 11 Cir. 1983, 706 F.2d 1103, *aff'd mem.,* 1983, —— U.S. ——, 104 S.Ct. 520, 78 L.Ed.2d 705. The district court denied the government the opportunity to present evidence concerning the history of the at-large system in Marengo County, a clearly erroneous ruling.

the Court. Both Representative Sensenbrenner and Senator Kennedy explicitly stated during debate that

"Section 2, unlike the bailout procedure added by this bill, will take effect immediately, and will, of course, apply to pending cases in accordance with the well established principles of *Bradley v. City of Richmond.* 416 U.S. [696] 686 [94 S.Ct. 2006, 40 L.Ed.2d 476] (1974) and *United States v. Alabama.* 362 U.S. 602 [80 S.Ct. 924, 4 L.Ed.2d 982] (1980)."

128 Cong.Rec. H3841 (daily ed. June 23, 1982) (remarks of Rep. Sensenbrenner); *id.* at S7095 (daily ed. June 18, 1982) (remarks of Sen. Kennedy).[11]

■ Our application of the amended version of section 2 will serve important public interests without doing any injustice to the parties. *Bradley* holds that in determining whether the application of new law is just, a court should consider "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." 416 U.S. at 717, 94 S.Ct. at 2019. All these considerations strongly support applying the amendment to this case.

The first consideration, the nature of the parties, arises from the distinction, described in *Schooner Peggy,* between private disputes and "great national concerns". Although it may not be imperative to apply new congressional enactments to preexisting disputes over private issues, when the new statute manifests important public policy, courts must respect that policy and apply it. There is no question that this case is a public matter, concerning the most fundamental of public rights, the right to participate in the political process.

The second consideration, the nature of the rights, is intended to protect personal rights that have "matured or become unconditional". *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. There are no such rights here. The defendants argue that to apply amended section 2 "would operate to deprive the state officials of a vested right to enact and/or maintain state laws, which at the time of the enactment, and at the times alleged in this suit, were being maintained under constitutionally acceptable conditions." Brief for Appellees at 8. Even assuming that the at-large system did not violate constitutional or statutory prohibitions effective in 1955 or 1978, the defendants' "vested right" theory is unsound. Under that theory segregated public transit would still be permissible since it was legal (according to *Plessy v. Ferguson* ) when adopted. The defendants fail to distinguish between retroactive and prospective application of the statute. This court is unconcerned with whether the enactment of the at-large system met the legal standards in effect in 1955. Rather, the question is whether the *present maintenance* of that system meets the standards in effect *now.* No government entity has a "vested right" to continue practices validly prohibited by Congress.

The third consideration "stems from the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2021. There is no such problem here. The defendants are "burdened" in no way by the application of the amended statute: they become liable for no added obligations on account of any actions taken before the statute became effective.[12]

The application of the amended statute to this case certainly does not work "manifest

---

**11.** The Senate Report refers to the district court's 1981 decision in this case as an example of why statutory change was required. 1982 Senate Report at 39 & n. 147. This suggests that Congress intended that its amendment of section 2 might change the result in this case and others like it when relief had previously been denied under the constitutional standard of discriminatory intent.

**12.** At oral argument the defendants put forth the contention that section 2 cannot be applied retroactively because violations of section 2 are punishable as criminal offenses under section 12 of the Voting Rights Act, 42 U.S.C. § 1973j(a), (c) (1976). The defendants assert that retroactive application of section 2 is therefore forbidden under Art. I, § 9, clause 3 of the Constitution, which prohibits Congress from passing any

injustice".[13] Moreover, that application also accords with the basic principle that courts do not issue advisory opinions. This lawsuit seeks only prospective relief, and only the legal standard governing now is relevant to whether a prospective remedy is appropriate. *See Rybicki v. State Board of Elections,* 1983, E.D.Ill., 574 F.Supp. 1147, 1148 n. 3 (3 judge court). If this Court rendered judgment under the old version of section 2, that judgment would have no res judicata effect, and a new lawsuit could be filed under the new law. *Kirksey v. City of Jackson,* 5 Cir.1983, 714 F.2d 42. To apply the old standard here, therefore, would be an exercise in futility: a finding in favor of the defendants would not be binding on the plaintiffs.

### III.

The defendants assert that a vote dilution claim is not cognizable under the amended version of section 2 of the Voting Rights Act. This argument is wholly without merit. The theory appears to be that section 2 is either a codification of the Fifteenth Amendment or based only on that amendment's enforcement clause, and that in either case the Fifteenth Amendment does not cover cases of vote dilution, which must be prosecuted only under the Fourteenth Amendment. This argument is faulty on several grounds. Although the plurality opinion in *Mobile v. Bolden* did suggest that vote dilution is a Fourteenth Amendment issue, 446 U.S. at 64–65, 100 S.Ct. at 1498–1499, we have since held that a majority of the Court in *Mobile* concluded that the Fifteenth Amendment, as well as the Fourteenth, protects not only against denial of the right to vote but against dilution of that right as well. *Lodge v.*

ex post facto law. There is nothing "retroactive" in our application of the amended statute to this case: the complaint seeks only prospective relief. Sections 2 and 12 do not impose criminal liability for actions, taken before the amended version of section 2 became effective, that were in conformity with the legal standards existing at the time.

*Buxton,* 639 F.2d at 1372–73; *United States v. Uvalde Consolidated Independent School District,* 5 Cir.1980, 625 F.2d 547, 551–552, *cert. denied,* 1981, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858; *accord Perkins v. City of West Helena,* 8 Cir.1982, 675 F.2d 201, 205–06, *aff'd mem.,* 1982, 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47. As Justice Frankfurter stated in *Lane v. Wilson,* 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281,

> "The reach of the Fifteenth Amendment against contrivances by a state to thwart equality in the enjoyment of the right to vote by citizens of the United States regardless of race or color, has been amply expounded by prior decisions. . . . The Amendment nullifies sophisticated as well as simple-minded modes of discrimination."

307 U.S. at 275, 59 S.Ct. at 876.

■ In any case, it *is* clear that the equal protection clause of the Fourteenth Amendment does apply to vote dilution, *Brown v. Board of School Commissioners of Mobile County,* 11 Cir.1983, 706 F.2d 1103, 1107, *aff'd mem.,* 1983, — U.S. —, 104 S.Ct. 520, 78 L.Ed.2d 705, and equally clear that the 1982 amendments to the Voting Rights Act were based on the enforcement clauses of both amendments. 1982 Senate Report at 39–43. Although *Mobile v. Bolden* held that the original version of section 2 was only a statutory codification of section 1 of the Fifteenth Amendment, Congress amended the statute to prohibit practices not directly prohibited by the Fifteenth Amendment. *See Mobile v. Bolden,* 446 U.S. at 61, 100 S.Ct. at 1496 (plurality opinion); *id.* at 105 n. 2, 100 S.Ct. at 1520 n. 2 (Marshall, J., dissenting); 1982 Senate Report at 39–40.

13. Although the defendants have not indicated that, in fact, they have additional evidence relevant to result, we are allowing the defendants an opportunity to introduce any such evidence on remand. *See* part VI of this opinion.

■ The defendants contend that it is "abundantly clear" that section 2 protects only "access to the political processes". We reject any assertion that the statute as amended applies only to formal barriers to access such as literacy or residency tests. The goal of the Voting Rights Act has always been to ensure an *effective* right of participation.[14] That this continues to be the case is made "abundantly clear" by the words of the amended statute and its history. The statute is violated if a protected class has "less opportunity than other members of the electorate to participate in the political process *and to elect representatives of their choice*". 42 U.S.C.A. § 1973(b) (West Supp.1983) (emphasis added). The act states further, "The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" in determining if the statute is violated. *Id.* The amendment was passed in direct response to the Supreme Court's decision in *Mobile v. Bolden,* a dilution case. In that decision the Court increased the burden on the plaintiffs by requiring them to prove intentional discrimination in election procedures. This "intent" standard was so difficult to meet that the Justice Department stopped bringing suits under section 2.[15] It would defy reason to hold that the amendment was not intended to cover the very type of case that provoked its passage. *See* 1982 Senate Report at 15–17. The legislative history both in support and in opposition to the amendment is replete with discussion of how the amendment will apply to vote dilution cases. There is not a word to suggest any doubt about *whether* it would apply to such cases. *See* Parker, *The "Results" Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L.Rev. 715, 762–64 (1983).

We therefore hold that the amended version of section 2 was intended to apply to the problem of vote dilution that this case presents. It remains for us to consider whether the amendment is constitutional, and if so, how it affects the district court's ruling in this case.

### IV.

The defendants argue that because the amended version of section 2 prohibits some voting practices not directly prohibited by the Constitution, it is unconstitutional. In the defendants' view, Congress usurped the power of the Supreme Court to interpret the Constitution by attempting to overrule *Mobile v. Bolden.* Congress explicitly acknowledged the binding effect of the Supreme Court's constitutional interpretation and relied not on any independent power to interpret the Constitution but rather on congressional power to *enforce* the Civil War Amendments. The defendants, however, contend that the enforcement power does not authorize Congress to adopt a statutory "results" test for voting discrimination.

■ The defendants argue that the scope of only the Fifteenth Amendment's enforcement clause is at issue, but for the reasons explained in part III of this opinion the question is rather the extent of the power of Congress under the Constitution as a whole. We therefore consider whether a statutory results test is authorized under the combined grant of authority in the enforcement clauses of the Fourteenth and Fifteenth Amendments. It has long been recognized that these provisions of the Constitution grant authority to Congress "no less broad than its authority under the Necessary and Proper Clause...." *City of Rome v. United*

---

14. For example, the preclearance provisions of section 5 were adopted to prevent states from devising new means of depriving blacks of the effective right to vote, after Congress banned the literacy tests and poll taxes previously used for that purpose. *South Carolina v. Katzenbach,*

1966, 383 U.S. 301, 334–35, 86 S.Ct. 803, 822, 15 L.Ed.2d 769, 790–791.

15. Christian Science Monitor, April 14, 1982, at 27 (column by Rep. Don Edwards of California).

*States,* 1980, 446 U.S. 156, 175, 100 S.Ct. 1548, 1560, 64 L.Ed.2d 119, 138; *accord South Carolina v. Katzenbach,* 1966, 383 U.S. 301, 326–327, 86 S.Ct. 803, 817–18, 15 L.Ed.2d 769, 785–86; *Ex parte Virginia,* 1880, 100 U.S. 339, 345–46, 25 L.Ed. 676, 679. The extent of the "necessary and proper" power was first explained by Chief Justice Marshall in *M'Culloch v. Maryland,* 1819, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579:

> "[T]he sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

17 U.S. (4 Wheat.) at 421. The enforcement clauses of the Civil War Amendments grant Congress the power to adopt

> "Whatever legislation is appropriate, that is, adapted to carry out the objects the Amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against state denial or invasion, if not prohibited, ...."

*Ex parte Virginia,* 100 U.S. at 345–46. Congress may invalidate the perpetuation of earlier purposeful discrimination, and act to eradicate the continuing effects of that discrimination. *City of Rome,* 446 U.S. at 176–77, 100 S.Ct. at 1561–62.

Congress has prohibited a variety of voting practices not necessarily prohibited directly by the Constitution, and the Supreme Court has upheld these exercises of the enforcement power. In *South Carolina v. Katzenbach,* 1966, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769, the Court upheld a suspension of literacy tests in specific jurisdictions. In *Katzenbach v. Morgan,* 1966, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828, the Court upheld a prohibition on the use of English literacy tests to disenfranchise citizens educated in Puerto Rico. In *Oregon v. Mitchell,* 1970, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272, the Court unanimously upheld a nationwide ban on literacy tests and by an 8–1 margin upheld limitations on residency requirements in presidential elections. In *South Carolina v. Katzenbach* and again in *City of Rome* the Court upheld the preclearance provisions of the Voting Rights Act, which require federal review of all changes in voting practices in certain jurisdictions and require the Attorney General to object to any change that is discriminatory either in purpose or effect.

The 1982 amendment to section 2 of the Voting Rights Act is clearly within the enforcement power. Congress conducted extensive hearings and debate on all facets of the Voting Rights Act[16] and concluded that the "results" test was necessary to secure the right to vote and to eliminate the effects of past purposeful discrimination. The Senate Report explains in detail why the results test was necessary and appropriate. In particular, Congress found

> "(1) that the difficulties faced by plaintiffs forced to prove discriminatory intent through case-by-case adjudication create a substantial risk that intentional discrimination barred by the Fourteenth and Fifteenth Amendments will go undetected, uncorrected and undeterred unless the results test proposed for section 2 is adopted; and (2) that voting practices and procedures that have discriminatory results perpetuate the effects of past purposeful discrimination."

---

**16.** *See, e.g.,* S.Rep. No. 417, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 177; H.Rep. No. 227, 97th Cong., 1st Sess. (1981); 128 Cong.Rec. S6638–56 (daily ed. June 10, 1982); *id.* Nos. 74–77 (daily eds. June 14–18, 1982) (Senate); 127 Cong.Rec. H6938–H7011 (daily ed. Oct. 5, 1982); 128 Cong.Rec. H3839–46 (daily ed. June 23, 1982).

1982 Senate Report at 40 (footnote omitted), U.S.Code Cong. & Admin.News 1982, p. 218.

Inquiry into the motives of elected officials can be both difficult and undesirable, and such inquiry should be avoided when possible.[17] The judicial and executive authorities charged with enforcing the laws may be reluctant to attribute an intent on the part of state and local officials to violate those laws.[18] In any event, proof of intent will often be hard to find:

"In almost all conceivable cases, the [officials who adopted or maintain the system] can articulate a plausible neutral reason for preferring the at-large method. Even where 'everyone knows' that racial considerations have had an influence on the decision, courts may be expected to be reluctant to label the decisionmakers as racists if they can avoid that unseemly task by accepting the neutral explanation. Where the responsible actor is the electorate itself, as it would be in a challenge based on a referendum, the difficulty of launching an inquiry into motive is compounded."

**17.** The intent test for discrimination has been the subject of extensive debate and criticism. Many authors have concluded that intent is too hard to define, too difficult to prove, or largely irrelevant to the goal of eradicating the effects of discrimination. *See generally* Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive,* 1971 Sup.Ct. Rev. 95; Ely, *Legislative and Administrative Motivation in Constitutional Law,* 79 Yale L.J. 1205 (1970); L. Tribe, *American Constitutional Law* 1028–32 (1978); *Legislative Motivation,* 15 San Diego L.Rev. 925 (1978). Similarly, *Mobile v. Bolden* has been debated and criticized. *See, e.g.,* Butler, *Constitutional and Statutory Challenges to Election Structures: Dilution and the Value of the Right to Vote,* 42 La.L.Rev. 851 (1982); Soifer, *Complacency and Constitutional Law,* 42 Ohio St.L.J. 383 (1981); *The Supreme Court, 1979 Term,* 94 Harv.L.Rev. 75, 138–49 (1980). This criticism does not alter the constitutional standard: the Constitution prohibits intentional discrimination. But Congress could rationally conclude that a different statutory standard would permit fuller enforcement of that constitutional prohibition. *See* Parker, note 1, 69 Va.L.Rev. at 737–50.

**18.** Congressional adoption of a statutory standard for voting rights cases is consistent with

Hartman, *Racial Vote Dilution and Separation of Powers: An Explanation of the Conflict Between the Judicial "Intent" and the Legislative "Results" Standards,* 50 Geo.Wash.L.Rev. 689, 711–12 (1982). *See Major v. Treen,* 1983, E.D.La., 574 F.Supp. 325, 346 (3 judge court). Congress agreed with this assessment.[19]

Congress noted that charges of purposeful discrimination can have a divisive impact on local communities. 1982 Senate Report at 36. Congress also found that proving intent can be time-consuming and very costly. *Id.* Congress found that these costs were not only large but often unnecessary. In particular, Congress referred to *Mobile v. Bolden.* That case was remanded and the district court again found a constitutional violation, but only after "a tremendous expenditure of resources", in which the court examined over one hundred years of historical records to establish that at-large elections were established for discriminatory reasons. 1982 Senate Report at 36. Congress concluded that such delays and extra costs created undesirable obstacles to the eradication of purposeful discrimination.

the judicial doctrine that constitutional litigation should be avoided where possible. At least once before Congress has enabled the courts to avoid a difficult constitutional issue by providing a statutory remedy under the Voting Rights Act. In section 4(e) of the 1965 Act, 42 U.S.C. § 1973b(e) (1976), Congress prohibited the use of English literacy tests to disenfranchise citizens educated in Puerto Rico and literate in Spanish. The Supreme Court sustained this provision in *Katzenbach v. Morgan,* 1966, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828. The Court was therefore able to avoid the more difficult issue of whether such a literacy test violated the Fourteenth Amendment. *Cardona v. Power,* 1966, 384 U.S. 672, 86 S.Ct. 1728, 16 L.Ed.2d 848 (remanding constitutional challenge for further consideration in the light of *Katzenbach v. Morgan*).

**19.** The Senate Report notes that intent may be hard to prove because of legislative immunity, incomplete legislative history, and the ease with which non-racial purposes for a law can be offered. 1982 Senate Report at 36–37 (footnotes omitted).

The defendants assert that Congress cannot prohibit discriminatory results under the enforcement power. The case law is uniformly to the contrary. In *City of Rome* the Court stated flatly that "Congress may prohibit voting practices that have only a discriminatory effect".[20] 446 U.S. at 175, 100 S.Ct. at 1560. Both *City of Rome* and *South Carolina v. Katzenbach* upheld prohibitions on changes having discriminatory effects in jurisdictions covered by the preclearance provisions of the Voting Rights Act. The defendants do not discuss *City of Rome*, but argue that *South Carolina v. Katzenbach* made extensive and detailed findings of purposeful discrimination in the covered jurisdictions. The defendants contend that only "exceptional conditions" akin to those discussed in *Katzenbach* sustain an exercise of the enforcement power. The defendants, however, make no mention of *Oregon v. Mitchell,* in which the Court sustained a *nationwide* ban on literacy tests without demanding evidence of nationwide purposeful discrimination.

As in *Oregon v. Mitchell,* nationwide application is justified here for many reasons.

Although there is no nationwide record of pervasive voting discrimination akin to the record of discrimination in the jurisdictions covered by preclearance, Congress did find evidence of substantial discrimination outside those jurisdictions. 1982 Senate Report at 92 n. 161. Congress had previously found that minority groups have been given inferior educational opportunities in localities throughout the nation and that literacy tests had been used to discriminate in jurisdictions not covered by preclearance. *See Oregon v. Mitchell,* 400 U.S. at 132–34, 91 S.Ct. at 268–69 (Opinion of Black, J.); *Id.* at 234–36, 91 S.Ct. at 319–20 (Opinion of Brennan, White, and Marshall, JJ.); S.Rep. No. 295, 94th Cong., 1st Sess. 21–35, *reprinted in* 1975 U.S.Code Cong. & Ad. News 774, 787–801. It was not unreasonable to conclude that these same nationwide problems could contribute to risks of discrimination through voting devices other than literacy tests. Moreover, minority residents of areas where purposeful discrimination is pervasive may and often do move to other areas, where the earlier discrimination against them impairs their ability to participate fully in the political pro-

**20.** The Court has also recognized congressional power to legislate against discriminatory effects in contexts other than voting. For example, in *Fullilove v. Klutznick,* 1980, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, Chief Justice Burger stressed that the Constitution authorizes Congress to eliminate disparities that have "their roots in racial and ethnic discrimination, and which continue today, even absent any intentional discrimination or other unlawful conduct." 448 U.S. at 478, 100 S.Ct. at 2774 (Opinion of Burger, C.J.); *accord id.* at 518–19, 100 S.Ct. at 2795–96 (Opinion of Marshall, J.). The Court has repeatedly upheld the power of Congress to prohibit discriminatory effects under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1976 & Supp. V 1981). *See, e.g., International Brotherhood of Teamsters v. United States,* 1977, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396, 423; *Griggs v. Duke Power Co.,* 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. We have held that Congress may apply the discriminatory effects standard of Title VII to the states. *Scott v. City of Anniston,* 5 Cir.1979, 597 F.2d 897, 899–900,

*cert. denied,* 1980, 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271. Another statute that prohibits conduct having a significant discriminatory effect, without proof of discriminatory intent, is the Fair Housing Act, 42 U.S.C. §§ 3601–3619 (1976 & Supp. V 1981). *United States v. Mitchell,* 5 Cir.1978, 580 F.2d 789, 791. The Courts of Appeal have unanimously upheld the power of Congress to apply this test to local governments. *See Smith v. Town of Clarkton,* 4 Cir.1982, 682 F.2d 1055, 1065; *United States v. City of Parma,* 6 Cir.1981, 661 F.2d 562, 571–72, 573, 576, *cert. denied,* 1982, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441; *Resident Advisory Board v. Rizzo,* 3 Cir.1977, 564 F.2d 126, 146–48, *cert. denied,* 1978, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499; *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 7 Cir.1977, 558 F.2d 1283, 1288–90, *cert. denied,* 1978, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772, *on appeal after remand,* 7 Cir.1980, 616 F.2d 1006, 1008, 1010–11; *United States v. City of Black Jack,* 8 Cir. 1974, 508 F.2d 1179, 1183–86, *cert. denied,* 1975, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694.

cess.[21] We take judicial notice of the fact that different minorities have been subject to different kinds of discrimination in different places.[22] Congress could justifiably conclude that a nationwide prohibition of voting practices with discriminatory results was necessary to remedy the effects of purposeful discrimination throughout the country. "Congress may paint with a much broader brush than may this Court...." *Oregon v. Mitchell*, 400 U.S. at 284, 91 S.Ct. at 344 (Opinion of Stewart, J.)

Finally, Congress found nationwide application of the results standard desirable to avoid the risk of stigmatizing certain areas of the country, and to avoid provoking sentiment that such areas "were unjustifiably singled out". 1982 Senate Report at 42, U.S.Code Cong. & Admin.News 1982, p. 220. By eliminating any appearance of regional discrimination, Congress made it more likely that state and local officials will comply with the law. Nationwide application also avoids the administrative difficulties of determining where a statute will apply and where it will not. *Oregon v. Mitchell*, 400 U.S. at 283–84, 91 S.Ct. at 343–44 (Opinion of Stewart, J.).

■ Section 2 therefore meets the first portion of the test laid down in *M'Culloch* and *Ex parte Virginia:* it is clearly an "appropriate" means for carrying out the goals of the Civil War Amendments. Nor is the results test prohibited by any other part of the Constitution. The defendants argue that section 2 is an impermissible infringement on state powers. But section 2 is far less of an interference with state powers than the preclearance provisions approved in *South Carolina v. Katzenbach* and *City of Rome*.[23] Nor does section 2 violate states' rights by limiting their choices of electoral processes. Section 2 leaves state and local governments free to choose the election system best suited to their needs, as long as that system provides equal opportunities for effective participation by racial and language minorities.[24]

■ The Civil War Amendments overrode state autonomy apparently embodied

---

21. *See Oregon v. Mitchell*, 400 U.S. at 233–34, 91 S.Ct. at 319–20 (Opinion of Brennan, White, and Marshall, JJ.); *id.* at 283, 91 S.Ct. at 344 (Opinion of Stewart, J.).

22. *See generally* S.Rep. No. 295, 94th Cong., 1st Sess. 24–35, *reprinted in* 1975 U.S.Code Cong. & Ad.News 774, 790–802 (discussing need for bilingual voting provisions of Voting Rights Act to protect Hispanic, Asian, and Native American citizens).

23. Preclearance has not always been effective, largely because covered jurisdictions have frequently overlooked or ignored their duty under the law to submit voting changes for approval, or have submitted the changes years after they were put into effect. *See* 1982 Senate Report at 11–14. For example, staggered terms were adopted in Marengo County in 1966, but the County's preclearance submission was not completed until April 6, 1978, twelve years after the change was carried out and nearly eight months after the private plaintiffs filed this lawsuit. (When the change was finally submitted, the Attorney General declined to interpose an objection, but noted that this decision was based only on the apparent effect of the 1966 change. The Attorney General made no representations regarding the validity of the 1955 adoption of at-large elections.) *See* Answer of Defendant Marengo County Board of Education, Exhibit A, Record 323–324. Congress has determined that preclearance is too expensive and time-consuming to be enforced effectively on a nationwide basis. *See* 1982 Senate Report at 14–15. Instead, Congress chose to rely on section 2— which does not require automatic review of all voting changes—"to challenge voting discrimination anywhere that it might be proved to occur". *Id.* at 15, U.S.Code Cong. & Admin. News 1982 p. 192.

24. The results test does *not*, contrary to the arguments of some of its opponents, effectively require jurisdictions to adopt proportional representation. States may retain the perceived benefits of at-large representation while providing opportunities for effective minority participation. A variety of alternatives are available. For example, a board with nine members might have six members elected by districts and three elected at large. *See Mobile v. Bolden*, 446 U.S. at 82, 100 S.Ct. at 1507 (Blackmun, J., concurring). Alternatively, all nine members could be elected at-large, but each voter could be given the right to vote for only five candidates, thus ensuring that minority political interests would have a chance to elect members to the board. Other alternatives are cumulative voting and transferable preferential voting. *See* Zimmer-

in the Tenth and Eleventh Amendments. *EEOC v. Wyoming,* 1983, 460 U.S. 226, —— n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18, 33 n. 18; *City of Rome,* 446 U.S. at 178–80, 100 S.Ct. at 1562–63; *Fitzpatrick v. Bitzer,* 1976, 427 U.S. 445, 453–56, 96 S.Ct. 2666, 2670–71, 49 L.Ed.2d 614, 620–22. The Civil War Amendments granted national citizenship to all blacks and guaranteed their right of access to the voting process. By their very nature they plainly empowered the federal government to intervene in state and local affairs to protect the rights of minorities newly granted national citizenship. *See City of Rome,* 446 U.S. at 179–80, 100 S.Ct. at 1562–63. "[T]he States can be required to tailor carefully the means of satisfying a legitimate state interest when fundamental liberties and rights are threatened ... and Congress is free to apply the same principle in the exercise of its powers." *Katzenbach v. Morgan,* 384 U.S. at 654 n. 15, 86 S.Ct. at 1725 n. 15. The states have an important interest in determining their election practices. But Congress could reasonably conclude that practices with discriminatory results had to be prohibited to reduce the risk of constitutional violations and the perpetuation of past violations. Today it is a small thing and not a great intrusion into state autonomy to require the states to live up to their obligation to avoid discriminatory practices in the election process.

The report of the Senate Subcommittee on the Constitution argued that section 2 was "retroactive" and that such "retroactivity" had never been approved by the Supreme Court. In part II of this opinion we have already explained, however, that there is nothing "retroactive" about section 2. It does not affect the validity of any election conducted before its passage. Section 2 is no more retroactive than were any of the Voting Rights Act provisions approved in previous Supreme Court cases.

*South Carolina v. Katzenbach* approved the suspension of literacy tests in covered jurisdictions although some of these tests may have been valid before the passage of the Voting Rights Act of 1965. *See Lassiter v. Northampton Election Board,* 1959, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072. *Katzenbach v. Morgan* approved the ban on New York's English-language literacy test as applied to Puerto Ricans, even though that test might have been valid under the standards existing before 1965. The 1970 Voting Rights Amendments similarly banned literacy tests, residency requirements, and age limits, many of which were unquestionably valid before the Act was passed. In *Oregon v. Mitchell* the Court approved all the 1970 Amendments except the age limits as applied to state and local elections; its disapproval of the age provision had nothing to do with "retroactivity".

The Senate Subcommittee on the Constitution also argued that the results test is unconstitutional because it "is offensive to the basic colorblind objectives of the Constitution". 1982 Senate Report at 172, U.S. Code Cong. & Admin.News 1982, p. 345. The Subcommittee argued that under the results test, "[c]onsiderations of race and color would become omnipresent and dominant". *Id.* at 173, U.S.Code Cong. & Admin.News 1982, p. 346. This is an argument of policy, not one of constitutionality. The Senate Report responds to the Subcommittee's concerns by noting that section 2 is intended to apply only where racial politics already "dominate[s] the electoral process". *Id.* at 33, U.S.Code Cong. & Admin. News 1982, p. 211. Section 2 is not meant to create race-conscious voting but to attack the discriminatory results of such voting where it is present.

■ The defendants argue, as did the Senate Subcommittee on the Constitution, that section 2 is an impermissible effort to

man, *The Federal Voting Rights Act and Alternative Election Systems,* 19 Wm. & Mary L.Rev. 621 (1978); Note, *Alternative Voting Systems as*

*Remedies for Unlawful At-Large Systems,* 92 Yale L.J. 144 (1982).

overturn the Supreme Court's interpretation of the Constitution in *Mobile v. Bolden.* The opponents of section 2 argue that it is not an exercise of the enforcement power but an effort to redefine the meaning of the Civil War Amendments by statute. There is no doubt that Congress amended section 2 principally because Congress was dissatisfied with the effect of *Mobile v. Bolden* on voting rights litigation. The Senate Report says so explicitly.[25] This is to be expected; had the Supreme Court not adopted an intent requirement in *Mobile v. Bolden,* the statutory amendment would have been unnecessary. But congressional disapproval of a Supreme Court decision does not impair the power of Congress to legislate a different result, as long as Congress had that power in the first place. The amendment to section 2 does change the standard that voting rights plaintiffs must meet. But those who argue that this change is tantamount to overruling *Mobile v. Bolden* miss the point of that case. That case held that direct violations of the substantive provisions of the Fourteenth and Fifteenth Amendments—that is, the provisions not amenable to statutory change—are established only when discriminatory purpose is shown. The Court also held that the Voting Rights Act, as then written, did not impose a different standard from that of the Constitution. But nothing in *Mobile v. Bolden* suggested that Congress could not prohibit by statute what the Court had

declined to forbid under the Constitution.[26] *City of Rome,* decided the same day, upheld legislation that prohibited discriminatory effects. It may well be that *Mobile v. Bolden* should be understood as an invitation by the Court to Congress to supplement the Constitution's fundamental, self-enforcing prohibition of purposeful discrimination. Basic to a governmental system resting on separation of powers is the power of Congress to go beyond the explicit provisions of the Constitution and to take steps that the courts are reluctant to take in the absence of legislation. *M'Culloch v. Maryland,* 1819, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579. The rule of *Mobile v. Bolden* is not that discrimination can be prohibited only if it is purposeful. It is rather that the courts, acting without statutory guidance, will go no further than to strike down purposeful discrimination. It is for Congress to decide how much further to go in fulfilling the goals of the Constitution. Congress has done so.

■■■■ In enacting the results test of section 2 Congress did not rely on, or even mention, any power to interpret the Constitution or to decide independently of the judiciary that certain practices directly violate the substantive provisions of the Constitution. We therefore need not consider any argument that Congress has such power, nor need we consider the limits on such a power.[27] Congress predicated its power to amend section 2 squarely, and only, upon

---

**25.** "In *Bolden,* a plurality of the Supreme Court broke with precedent and substantially increased the burden on plaintiffs in voting discrimination cases by requiring proof of discriminatory purpose. The Committee has concluded that this intent test places an unacceptably difficult burden on plaintiffs. It diverts the judicial injury [sic] from the crucial question of whether minorities have equal access to the electoral process to a historical question of individual motives.

 "In our view, proof of discriminatory purpose should not be a prerequisite to establishing a violation of Section 2 of the Voting Rights Act."
1982 Senate Report at 16, U.S.Code Cong. & Admin.News 1982, p. 193; *see also id.* at 36–37.

**26.** Indeed, the plurality took pains to determine whether section 2, as it then stood, added anything to the plaintiffs' case, even though the lower courts had not separately considered the statutory cause of action. 446 U.S. at 60–61, 100 S.Ct. at 1495–1496 (Opinion of Stewart, J.).

**27.** Because Congress did not rely on any power to interpret the Constitution, we need not become embroiled in the heated dispute concerning the existence and extent of that power. *See* Buchanan, *Katzenbach v. Morgan and Congressional Enforcement Power Under the Fourteenth Amendment: A Study in Conceptual Confusion,* 17 Hous.L.Rev. 69 (1979); Burt, *Miranda and Title II: A Morganatic Marriage,* 1969 Sup.Ct. Rev. 81; Cohen, *Congressional Power to Interpret Due Process and Equal Protection,* 27 Stan.

the enforcement power. 1982 Senate Report at 39–43. Nothing more is necessary to sustain the statute. Section 2 does not conflict with or contract any right protected by the Constitution, and nothing in the Constitution either explicitly or implicitly prohibits a results standard for voting rights violations. Under the test of *M'Culloch*, section 2 is "consist[ent] with the letter and spirit of the constitution", 17 U.S. (4 Wheat.) at 421, and is clearly constitutional. *Accord Jones v. City of Lubbock*, 5 Cir.1984, 727 F.2d 364, 372–75; *Major v. Treen*, 1983, E.D.La., 574 F.Supp. 325, 342–49 (3 judge court).

## V.

The United States urges us, on the basis of the record now before us, to hold as a matter of law that Marengo County's at-large election system has a discriminatory result and violates amended section 2. We do not do so, for the reasons explained in part VI of this opinion. At the trial, the district court's ultimate inquiry in this case was whether the plaintiffs had demonstrated discriminatory intent. 469 F.Supp. at 1178, 1180. Certain language in the district court's opinion, however, indicates that the court also held that Marengo County's at-large system is not responsible for any lack of minority access to the political system and would therefore pass muster under a results or effects test as well. The court stated that it was "convinced that the lack of black success in Marengo County elections results not from a lack of access to the political system, but rather from a failure of the blacks to turn out as many of their half of the voters as do the whites". 469 F.Supp. at 1161 n. 7. The court also stated that "it is clear that if the

blacks could overcome voter apathy and turn out their votes, they could succeed in spite of polarization". *Id.* at 1163. These findings are based on a misconception of law and are clearly erroneous. To ensure that upon remand this case is decided under correct legal standards, we find it necessary to explain in some detail how the "results" test of section 2 is to be applied to an allegation that an at-large system unlawfully dilutes minority votes.

### A.

Congress chose the language of the statute with great care. Congress wished to eliminate any intent requirement from section 2, and therefore changed the terms of § 2(a), 42 U.S.C.A. § 1973(a) (West Supp. 1983), to forbid any practice that "results in" discrimination. Congress used the word "results" to make clear that the section 2 standard was not intended to be equivalent to the "effects" test of the preclearance provisions of section 5. 1982 Senate Report at 68. In section 2(b), 42 U.S.C.A. § 1973(b) (West Supp.1983), violations of subsection (a) are defined in language taken from *White v. Regester*, 1973, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314. In *White* the Court stated that in a dilution case the plaintiffs could not succeed merely by showing that racial groups were not represented in proportion to their voting potential:

"The plaintiffs' burden is to produce evidence supporting findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to partici-

---

L.Rev. 603 (1975); Cox, *The Role of Congress in Constitutional Determinations,* 40 U.Cin.L.Rev. 199 (1971). Furthermore, there is a crucial difference between the Voting Rights Act and the proposals to ban abortion or school busing by statute, referred to by the opponents of section 2, *see, e.g.,* 1982 Senate Report at 171 n. 23, 184 (Subcommittee Report). The Voting Rights Act does not conflict with any provision of the

Constitution that protects individual rights from impairment by Congress and the states. The only interests that section 2 arguably impairs are the states' interests in adopting electoral practices that have a discriminatory result. Such a state interest is a contradiction in terms. As this opinion explains elsewhere, section 2 is not unconstitutional on states' rights grounds.

pate in the political processes and to elect legislators of their choice."

412 U.S. at 766, 93 S.Ct. at 2339. The language of *White*, generalized to cover all elections and elected officials, is the fundamental standard of section 2. But Congress added a further provision to make certain that proportional representation is not required. As amended, section 2 now reads:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

"(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

42 U.S.C.A. § 1973 (West Supp.1983).[28]

▮▮▮▮ The language and history of the statute make clear several points. First, discriminatory intent need not be shown to establish a violation.[29] Second, at-large elections are not prohibited per se, nor does a lack of proportional representation automatically require a finding of a violation. At the same time, however, the absence of minority elected officials may be considered as an indicium of violation,

28. The original statute read simply,
"No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."
Pub.L. No. 89–110, § 2, 79 Stat. 437, 437 (1965). The reference to 42 U.S.C. § 1973b(f)(2) was added in 1975, when Congress expanded the Voting Rights Act to include minority language groups. Pub.L. No. 94–73, sec. 206, 89 Stat. 400, 402 (1975).

29. As stated, the language of section 2 is taken from *White v. Regester.* In *Mobile v. Bolden* the plurality interpreted *White* as requiring a showing of discriminatory intent. 446 U.S. at 66, 68–70, 100 S.Ct. at 1499, 1500–1501. Several legislators therefore argued that section 2 does contain an intent requirement. *See, e.g.,* Senate Report at 104 n. 24, (Additional Views of Sen. Hatch); *id.* at 189–93 (Additional Views of Sen Laxalt); *id.* at 236–37 (Minority Views of Sen. East); 128 Cong.Rec. H3844–45 (daily ed. June 23, 1982) (statement of Rep. Lungren). The statute and the committee reports, however, could not be clearer. After the House had adopted a version of section 2 that some legislators feared would mandate proportional representation, Senator Dole, along with Senators Kennedy and Mathias, proposed the "compromise" language that was eventually enacted. *See* 1982 Senate Report at 3–4, 75. That language explicitly adopts a "results" test, and nowhere calls for any consideration of intent. The Senate Report emphasizes in the strongest possible terms that section 2 contains no intent requirement. *E.g., id.* at 2, 15–39, 67–68; *see also id.* at 88 (Additional Views of Senator Thurmond); *id.* at 193–195 (Additional Views of Senator Dole). The floor debates are equally clear on this point. *See, e.g.,* 128 Cong.Rec. S6930–31 (daily ed. June 17, 1982) (statement of Sen. DeConcini); *id.* S6941–44 (statement of Sen. Mathias); *id.* S6956–65 (debate concerning proposed amendment to restore intent test; the Senate rejected this amendment 81–16); *id.* S6995–96 (colloquy of Sen. Kennedy and Sen. Stevens); *id.* S7095 (daily ed. June 18, 1982) (statement of Sen. Kennedy); *id.* S7119 (statement of Sen. Dole); *id.* S7138 (statement of Sen. Robert Byrd); *id.* H3841 (daily ed. June 23, 1982) (statement of Rep. Sensenbrenner). *Accord Jones v. City of Lubbock,* 727 F.2d at 378–80; *Velasquez v. City of Abilene,* 5 Cir.1984, 725 F.2d 1017, 1023.

and an at-large system will violate the statute *if* it results in a denial of equal participation.[30] Congress noted that some at-large systems diluted black votes, and would be vulnerable under the amended statute. 1982 Senate Report at 6. Third, section 2 focuses not on whether minority groups receive adequate public services but on whether minorities have an equal right to *participate* in the political process. *See id.* at 36.

The Senate Report gives particular approval to the jurisprudence developed by the former Fifth Circuit in cases immediately following *White v. Regester,* most notably *Zimmer v. McKeithen,* 5 Cir.1973, 485 F.2d 1297 (en banc), *aff'd per curiam sub nom. East Carroll Parish School Board v. Marshall,* 1976, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296. *Zimmer* listed a number of factors to be considered in dilution cases.[31] The Senate Report repeats and elaborates on this list, characterizing them as "typical factors".[32] These factors are to be weighed under a "totality

---

**30.** The principal purpose of the compromise language offered by Senators Dole, Kennedy, and Mathias was to make clear that although a lack of proportional representation may be considered, section 2 does not *require* proportional representation. *See, e.g.,* 1982 Senate Report at 30–35; *id.* at 88 (Additional Views of Sen. Thurmond); *id.* at 193–94 (Additional Views of Sen. Dole); *id.* at 196–99 (Additional Views of Sen. Grassley); 128 Cong.Rec. S6717–18 (daily ed. June 14, 1982) (colloquy of Sen. Tower and Sen. Moynihan); *id.* S6778 (daily ed. June 15, 1982) (statement of Sen. Specter); *id.* S6962 (daily ed. June 17, 1982) (colloquy of Sen. Thurmond and Sen. Dole); *id.* S7118–19 (daily ed. June 18, 1982) (statement of Sen. Thurmond); *id.* S7119 (statement of Sen. Dole). The Committee on the Judiciary rejected amendments that would have prohibited the courts from considering the existence of an at-large election system as evidence of a section 2 violation. 1982 Senate Report at 4. It is clear that an at-large system may violate section 2. *See* part III of this opinion.

**31.** "Clearly, it is not enough to prove a mere disparity between the number of minority residents and the number of minority representatives. Where it is apparent that a minority is afforded the opportunity to participate in the slating of candidates to represent its area, that the representatives slated and elected provide representation responsive to minority's needs, and that the use of a multi-member districting scheme is rooted in a strong state policy divorced from the maintenance of racial discrimination, *Whitcomb v. Chavis,* [1971, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363,] would require a holding of no dilution. *Whitcomb* would not be controlling, however, where the state policy favoring multi-member or at-large districting schemes is rooted in racial discrimination. Conversely, where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. The Supreme Court's recent pronouncement in *White v. Regester, supra,* demonstrates, however, that all these factors need not be proved in order to obtain relief."
485 F.2d at 1305 (footnotes omitted).

**32.** "Typical factors include:
1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

of the circumstances" approach.[33]

We organize our review of those findings in the same way. We emphasize, however, that the *Zimmer* factors serve a different purpose in litigation under section 2 from their purpose in constitutional litigation.

### B.

In this section we list the factors considered by the district court and explain the relevance, under amended section 2, of these factors and of the district court's findings. We take them in a somewhat different order from that of the district court because of the different emphasis placed on different factors by the results test.

#### Racially polarized voting

 The statute explicitly calls for a "totality-of-the circumstances" approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim. 1982 Senate Report at 28–30. We therefore do not hold that a dilution claim cannot be made out in the absence of racially polarized voting. But the legislative history indicates that this factor will ordinarily be the keystone of a dilution case.

To some extent the significance of racially polarized voting is obvious. "[I]n the absence of racially polarized voting, black candidates could not be denied office because they were black, and a case of ... dilution could not be made." *Nevett v. Sides*, 5 Cir.1978, 571 F.2d 209, 223 n. 16, *cert. denied*, 1980, 446 U.S. 951, 100 S.Ct.

2916, 64 L.Ed.2d 807; *see also Rogers v. Lodge*, 458 U.S. at 623–24, 102 S.Ct. at 3279. The importance of polarized voting to a plaintiff's case also grows out of the purposes of amended section 2 and the limits placed upon its scope. The report of the Senate Subcommittee on the Constitution argued that a results test would create race-consciousness and racial polarization. The Subcommittee also argued that the results test made the unwarranted assumptions "that race is the predominant determinant of political preference" and "that the decisions of elected officials are predominantly determined by racial classification". 1982 Senate Report at 148–49, U.S. Code Cong. & Admin.News 1982, p. 321. The majority report responded:

"The Subcommittee Report claims that the results test assumes 'that race is the predominant determinant of political preference.' The Subcommittee Report notes that in many cases racial bloc voting is not so monolithic, and that minority voters do receive substantial support from white voters.

"That statement is correct, but misses the point. It is true with respect to most communities, and in those communities it would be exceedingly difficult for plaintiffs to show that they were effectively excluded from fair access to the political process under the results test.

"Unfortunately, however, there still are some communities in our Nation where racial politics do dominate the electoral process.

"In the context of such racial bloc voting, and other factors, a particular election

---

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

"While these enumerated factors will often be the most relevant ones in some cases other factors will be indicative of the alleged dilution."

1982 Senate Report at 28–29 (footnotes omitted), U.S.Code Cong. & Admin.News 1982, pp.

206–207. Like the Senate Report, we do not preclude the possibility that factors other than those enumerated in *Zimmer* may be relevant in an appropriate case.

**33.** "The cases demonstrate, and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."

1982 Senate Report at 29, U.S.Code Cong. & Admin.News 1982, p. 207.

method can deny minority voters equal opportunity to participate meaningfully in elections.

\* \* \* \* \* \*

"The results test makes no assumptions one way or the other about the role of racial political considerations in a particular community. If plaintiffs assert that they are denied fair access to the political process, in part, because of the racial bloc voting context within which the challenged election system works, they would have to prove it."

*Id.* at 33–34 (footnote and italicization omitted), U.S.Code Cong. & Admin.News 1982, pp. 211–12.

This section of the Senate Report makes it clear that section 2 is intended not to create race-conscious politics, but to remedy it where it already exists. The surest indication of race-conscious politics is a pattern of racially polarized voting.

In the present case the defendants argue that an elected official does not "have to be of a particular race to adequately represent that race". Brief for the Appellees at 30. We completely agree with this statement and look hopefully toward the day when elections in Marengo County are conducted without regard to the race of the candidates. But the evidence demonstrates that day has not come, at least as of 1978. The district court found extremely strong evidence of polarized voting in elections before 1978, and continuing, through somewhat reduced, polarization in the 1978 elections.[34] Race is, as it has been since blacks were allowed to vote, the main issue in Marengo County politics.[35]

*Past discrimination and its lingering effects*

A history of discrimination is important evidence of both discriminatory intent and discriminatory results. A history of pervasive purposeful discrimination may provide strong circumstantial evidence that the present-day acts of elected officials are motivated by the same purpose, or by a desire to perpetuate the effects of that discrimination. *Rogers v. Lodge,* 458 U.S. at 624, 102 S.Ct. at 3279. Under the results test, the inquiry is more direct: past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs.[36] *See Zimmer,* 485 F.2d at 1306.

The historical record of discrimination in Marengo County is undisputed, and it has

**34.** The plaintiffs in this case proved polarization through direct statistical analysis of the vote returns. We have stated that "[b]loc voting may [also] be indicated by a showing under *Zimmer* of ... past discrimination in general ..., large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographic subdistricts", or by "the consistent lack of success of qualified black candidates". *Nevett,* 571 F.2d at 223 n. 18. *See also Jones v. City of Lubbock,* 5 Cir.1984, 730 F.2d 233, 233–36 (Higginbotham, J., concurring).

**35.** In addition to the strong statistical evidence, evidence of racial polarization in Marengo County may be gleaned from, for example, the school board's primary concern with placating whites, *see* 469 F.Supp. at 1170, and from the district court's observations in *Lee v. Marengo County Board of Education,* 1978, S.D.Ala., 454 F.Supp. 918, *rev'd and remanded,* 5 Cir.1979,

588 F.2d 1134, *cert. denied,* 1979, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38. In that school desegregation opinion, the court expressed serious doubts that Marengo County whites would attend desegregated black majority schools. 454 F.Supp. at 931 n. 20, 934. Such attitudes are strong circumstantial evidence that race continues to dominate politics in Marengo County.

**36.** The district court assumed that the history of private discrimination in Marengo County is irrelevant to this case. 469 F.Supp. at 1173 n. 32. But under the results standard of section 2, pervasive private discrimination should be considered, because such discrimination can contribute to the inability of blacks to assert their political influence and to participate equally in public life. *See Major v. Treen,* 1983, E.D.La., 574 F.Supp. 325, 341 (3 judge court).

not ended even now. The county school system remains under judicial supervision; and in 1978, while this case was being tried, the district court characterized the Board of Education as "obdurately obstinate" in its opposition to desegregation. *Lee v. Marengo County Board of Education*, 1978, S.D.Ala., 454 F.Supp. 918, 931. The judicial opinions recording the efforts of the United States and private plaintiffs to desegregate the public schools of this small rural county would fill a small volume.[37] Federal courts had to intervene to end discrimination on Marengo County's grand and petit juries. *Black v. Curb*, 5 Cir.1970, 422 F.2d 656. And, of course, a long series of lawsuits was necessary to enforce the rights of blacks in Marengo County to vote and run as candidates.[38] This is not to mention cases of statewide application too numerous to list completely. For example, in *Alabama State Teachers Ass'n v. Lowndes County Board of Education*, 1968, M.D.Ala., 289 F.Supp. 300 (3 judge court) the court struck down a series of statutes that denied tenure to teachers in predominantly black counties, including Marengo. The district court opinion lists many other cases of statewide application. 469 F.Supp. at 1172–73.

The district court acknowledged this history of discrimination, but then stated that the plaintiffs had "adduced very little evidence" as to "whether such past discrimination has in any way precluded effective present participation by blacks", *id.* at 1173, and concluded that the "present lingering effects of past discrimination among blacks ... do not manifest themselves so completely in political matters as they do in other everyday affairs", *id.* at 1180.

The district court concluded that past discrimination does not substantially impair the ability of blacks to participate in the political process. The record fails to support this conclusion. Because blacks are poorer and less educated they have less political influence than whites. Blacks still register and vote in significantly lower numbers than whites. The district court was well aware of this fact but attributed the absence of elected black officials to "voter apathy" and "a failure of blacks to turn out their votes". *Id.* at 1163. Reasoning that as of 1978 there were an estimated 7,040 black voters, and that the winners of most previous elections had received 5,000 – 6,000 votes, the court speculated that "if the blacks could overcome voter apathy and turn out their votes, they could succeed in spite of polarization". *Id.*

Both Congress and the courts have rejected efforts to blame reduced black participation on "apathy". The Senate Report states,

"The courts have recognized that disproportionate educational[,] employment, income level[,] and living conditions arising from past discrimination tend to depress minority political participation .... Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their dispa-

37. *See Lee v. Macon County Board of Education,* M.D.Ala., 267 F.Supp. 458 (3 judge court), *aff'd mem. per curiam sub nom. Wallace v. United States,* 1967, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422; *Lee v. Macon County Board of Education,* 5 Cir.1971, 443 F.2d 1367; *Lee v. Macon County Board of Education,* 5 Cir.1972, 465 F.2d 369; *Lee v. Marengo County Board of Education,* 1978, S.D.Ala., 454 F.Supp. 918, *rev'd and remanded,* 5 Cir.1979, 588 F.2d 1134, *cert. denied,* 1979, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38; *Lee v. Linden City School System,* 5 Cir.1980, 617 F.2d 383; *Lee v. Demopolis City School System,* 5 Cir.1977, 557 F.2d 1053, *cert. denied,* 1978, 434 U.S. 1014, 98 S.Ct. 729, 54

L.Ed.2d 758. The record also contains more than a dozen unpublished opinions in the school desegregation case. Record 58, 61–194.

38. *See United States v. Elsberry,* S.D.Ala., No. 3791-65; *United States v. Marengo County,* S.D. Ala., No. 1567; *United States v. Executive Committee of the Democratic Party of Greene County,* 1966, S.D.Ala., 254 F.Supp. 543; *Hadnott v. Amos,* 1970, M.D.Ala., 320 F.Supp. 107 (3 judge court), *aff'd mem.,* 1971, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318, *and* 1972, 405 U.S. 1035, 92 S.Ct. 1304, 31 L.Ed.2d 576.

rate socio-economic status and the depressed level of political participation." 1982 Senate Report at 29 n. 114. *See also Major v. Treen,* 1983, E.D.La., 574 F.Supp. 325, 351 n. 31.

This Court ha:; rejected the speculation the district court offered. In *Kirksey v. Board of Supervisors of Hinds County,* 5 Cir.1977, 554 F.2d 139 (en banc), *cert. denied,* 1977, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454, the district court approved a redistricting plan that cut up the black community and left it a minority in each of the five voting districts. The district court held that this plan gave blacks a "realistic opportunity" of winning elections in two districts where blacks were 48–49% of the voting age population. *Id.* at 150. The Court of Appeals rejected this approach. It held: "The responsibility of the defendants to permit minority voters a proper role in democratic political life must be discharged by stronger stuff than gossamer possibilities of all variables falling into place and leaning in the same direction." *Id.*

■■■ The Fifth Circuit also established that when there is clear evidence of present socioeconomic or political disadvantage resulting from past discrimination, as there was in this case, the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation, but rather is on those who deny the causal nexus to show that the cause is something else. *Cross v. Baxter,* 5 Cir.1979, 604 F.2d 875, 881–82; *Kirksey,* 554 F.2d at 144–46; *Zimmer,* 485 F.2d at 1306; *see also* Hartman, 50 Geo.Wash.L.Rev. at 727–29. There was certainly no substantial evidence in the present case to support an attribution of depressed black political participation to "apathy" unconnected with historical discrimination.[39]

*Access to the slating process*

In jurisdictions where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization and to receive its endorsement may be of paramount importance. In *White v. Regester,* for example, the Supreme Court found it significant that only two blacks had ever been endorsed by the Dallas County Committee for Responsible Government, "a white-dominated organization that is in effective control of Democratic Party candidate slating in Dallas County". 412 U.S. at 766–67, 93 S.Ct. at 2339–40. Apparently, there was no similar organization in Marengo County. The district court did not directly address the question whether there was a more informal slating process that ensured a white candidate for every office. In the broadest sense of the term "access to slating"—that is, the ability to run for office— there does not appear to have been any substantial formal or informal impediment to black candidacies. We do note, however, that in 1978 only 7 of the 34 members of the Marengo County Democratic Executive Committee were black. 469 F.Supp. at 1162 n. 10.[40]

*Election practices*

■■■ Two election practices exacerbated the deficiencies in black participation: the low number of black poll officials and the failure of the registrar to abide by state law. The district court stated,

> "On the poll official appointment question, the plaintiffs allege that the appointments made by the County Appointing Authority have been racially motivated and tend toward tokenism. They contend that it is important to have black

**39.** The district court cited *Nevett v. Sides* as authority for its conclusion that apathy, not polarized voting, was responsible for the consistent failure of blacks to win election. There is a critical difference between *Nevett* and this case, however: in *Nevett,* 6 of 7 black candidates *won* in the 1968 election, although none won in 1972. 571 F.2d at 214. It was therefore far from obvious in 1976, when the case was tried, that the at-large system prevented blacks

from participating in the political process. 571 F.2d at 227.

**40.** Minority candidates may also be denied effective access to the slating process if racial discrimination prevents them from actively seeking white votes and support. *See Perkins v. City of West Helena,* 8 Cir.1982, 675 F.2d 201, 209–10.

poll officials so that black voters will have more confidence in the electoral system. The evidence before the Court reflects that the assertions of the plaintiffs are to a large extent true .... [O]ne black was appointed at each polling place for the 1970 election, and there is no evidence that this number has increased to any great extent."

469 F.Supp. at 1161 (footnote omitted).[41] The court concluded, however, "that this inequity is not of such magnitude as to deprive blacks of access to the political process." *Id.* at 1162 (footnote omitted).

The plaintiffs also showed that the County Board of Registrars was open only two days a month except in election years; that, contrary to state law, the Board of Registrars met only in Linden, the county seat, and failed to visit outlying areas to register rural voters [42]; and that the Board had never acted on the offer of a black, Earnest Palmer, to serve as a deputy registrar.[43] The court said it did not see how these policies discriminated against blacks. *Id.* at 1164.

These policies, however, unquestionably discriminated against blacks because fewer blacks were registered. If blacks are to take their rightful place as equal participants in the political process, affirmative efforts were and are necessary to register voters and to assist those who need assistance.[44] By holding short hours the Board made it harder for unregistered voters, more of whom are black than white, to register. By meeting only in Linden the Board was less accessible to eligible rural voters, who were more black than white. By having few black poll officials and spurning the voluntary offer of a black citizen to serve as a registrar, county officials impaired black access to the political system and the confidence of blacks in the system's openness. *See United States v. Palmer,* 5 Cir.1966, 356 F.2d 951, 952.

*Enhancing factors*

■ A vote dilution case "is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts". *Zimmer,* 485 F.2d at 1305. Marengo County has a majority vote requirement in the Democratic Party primary, although not in the general election. 469 F.Supp. at 1174. Candidates for the School Board and County Commission run for specific posts, based on residency districts except for the presiding officers' positions. Marengo County has a small population but a large, rural area, and accordingly the county-wide campaign for an at-large position is expensive. Since blacks earn, on the average, less than half of the amount that whites earn, the district court correctly found that the size of the county contributes to dilution. On balance, the features of the electoral system operate to submerge minority interests, although they do provide for some geographical diversity.[45] This geographic diversity, however, does not operate to re-

---

**41.** Under Ala.Code § 17–6–1 (1975 & Supp.1983) poll officials are appointed by a County Appointing Authority comprised of the probate judge, sheriff, and circuit court clerk.

**42.** Until 1978, the board of registrars was required to "visit each precinct at least once and more often if necessary between October 1 and December 31 of each odd-numbered year to make a complete registration of all persons entitled to register, and shall remain there at least one half a day". Ala.Code § 17–4–1 (1975) (repealed by Act of April 27, 1978, No. 584, § 34, 1978 Ala.Acts 667, 677). Under the new law, Ala.Code § 17–4–156(f) (Supp.1983), the board is authorized to hold special registration sessions away from the courthouse.

**43.** Under Ala.Code § 17–4–158 (Supp.1983), enacted in 1978, the board of registrars may appoint deputy registrars to serve without compensation.

**44.** *See generally* Note, *Eradicating Racial Discrimination in Voter Registration: Rights and Remedies Under the Voting Rights Act Amendments of 1982,* 52 Fordham L.Rev. 93 (1983).

**45.** Marengo County has no anti-single-shot law. When voters can cast more than one vote in the same race, an anti-single-shot provision can force minority voters to vote for majority candidates. *Nevett,* 571 F.2d at 217 n. 10. As the district court correctly found here, such a provi-

duce *racial* dilution, because the white majority still elects whites to represent all the residency districts.[46]

### Racial appeals

■■ The court found no evidence of overt or subtle racial appeals, and placed little credence in evidence offered to show that black voters were intimidated. In the seventies overt political racism was less prevalent than in the sixties. "As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find." *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 7 Cir.1977, 558 F.2d 1283, 1290, *cert. denied*, 1978, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772. But the continuing effects of past discrimination are still with us. This is one of the principal reasons Congress found it necessary to adopt a results test to root out the effects of past discrimination. 1982 Senate Report at 36–37; *Major v. Treen*, 574 F.Supp. at 346. Evidence of racism can be very significant if it is present. *See Perkins v. City of West Helena*, 675 F.2d at 216–17. But its absence should not weigh heavily against a plaintiff proceeding under the results test of section 2.

### State policy

■■ Under an intent test, a strong state policy in favor of at-large elections, for reasons other than race, is evidence that the at-large system does not have a discriminatory intent. On the other hand, a tenuous explanation for at-large elections is circumstantial evidence that the system is motivated by discriminatory purposes. *See Robinson v. Commissioners Court*, 5 Cir.1974, 505 F.2d 674, 680; *Zimmer*, 485 F.2d at 1305, 1307. State policy is less important under the results test: "even a consistently applied practice premised on a

racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process". 1982 Senate Report at 29 n. 117, U.S.Code Cong. & Admin.News 1982, p. 207, n. 117. But state policy is still relevant insofar as intent is relevant to result: evidence that a voting device was intended to discriminate is circumstantial evidence that the device has a discriminatory result. *See Major v. Treen*, 574 F.Supp. at 354–55. Moreover, the tenuousness of the justification for a state policy may indicate that the policy is unfair. *Hendrix v. Joseph*, 5 Cir.1977, 559 F.2d 1265, 1269–70.

The district court found that there was no strong state policy either for or against at-large elections. The court erroneously stated that Marengo County's at-large provisions were adopted "in 1923 and 1935 when blacks had been effectively disenfranchised" and therefore those provisions could not have been motivated by race. In fact, at-large elections were adopted in 1955, just after the Supreme Court decided *Brown v. Board of Education*, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. It is fair to infer that at-large elections were enacted in direct response to the prospect of increased black political participation.

### Success of minority candidates

■■ If members of the minority group have not been elected to public office, it is of course evidence of vote dilution. Section 2(b) explicitly permits the court to consider "[t]he extent to which members of a protected class have been elected", but in the next breath warns that the statute does not establish a right to proportional representation. 42 U.S.C.A. § 1973(b) (West Supp. 1983). The Senate Report states that this disclaimer was intended to incorporate certain judicial precedents rejecting racial quotas. 1982 Senate Report at 30–31. Less than proportional representation clearly

sion is irrelevant when candidates run for specific positions. 469 F.Supp. at 1175.

**46.** The exception is Moses Lofton, a black who was appointed to represent the southeast district on the School Board.

does not automatically violate section 2. But it is equally clear that the election of one or a small number of minority elected officials will not compel a finding of no dilution. *Id.* at 29 n. 115. "Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds." *Zimmer,* 485 F.2d at 1307. *See also National Association for the Advancement of Colored People v. Gadsden County School Board,* 11 Cir.1982, 691 F.2d 978, 983.

The record shows, as of 1978, that *no* black had ever been elected to either the School Board or the County Commission. One had been *appointed* to the school board, but the warning of *Zimmer,* quoted above, is particularly appropriate to such an appointment. The appointment of one black to the School Board, while it may have demonstrated an increased willingness of Marengo County whites to allow black individuals to participate, certainly does not demonstrate the ability of black voters to elect officials.[47] One other black was elected, to the post of County Coroner. These were the only two blacks to take office despite numerous black candidacies. This evidence can be interpreted only as strong evidence of dilution. The district court's conclusion that this nearly complete lack of success did not indicate a lack of effective access to the system, 469 F.Supp. at 1161, is clearly erroneous.

*Unresponsiveness*

Under an intent test the responsiveness of elected officials to minority needs is an important factor. If the officials are unre-

sponsive it suggests that they are willing to discriminate against minorities and need not be accountable to minority interests. *Rogers v. Lodge,* 458 U.S. at 625 & n. 9, 102 S.Ct. at 3280 & n. 9.

Unresponsiveness is considerably less important under the results test. A panel of this Court has concluded that responsiveness "has nothing to do with [discriminatory] impact". *NAACP v. Gadsden County,* 691 F.2d at 983. Other authorities suggest that unresponsiveness does have some relevance in a section 2 case. If minority needs are not served it is evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power. *See Hendrix,* 559 F.2d at 1268–69; *Kirksey,* 554 F.2d at 143–46. But unresponsiveness is of limited importance under section 2 for two reasons. First, section 2 protects the access of minorities not simply to the fruits of government but to participation in the process itself. Accordingly, evidence that officials meet the functional needs of minority citizens does not overcome evidence that the minorities are excluded from political participation. Second, responsiveness is a highly subjective matter, and this subjectivity is at odds with the emphasis of section 2 on objective factors. The Senate Report states that "defendants' proof of some responsiveness would not negate plaintiff's showing by other, more objective factors enumerated here that minority voters nevertheless were shut out of equal access to the political process". 1982 Senate Report at 29 n. 116, U.S.Code Cong. & Admin. News 1982, p. 207, n. 116. The authors of the Senate Report apparently contemplated that unresponsiveness would be relevant only if the plaintiff chose to make it so,[48] and that although a showing of unresponsiveness might have some probative value a showing of responsiveness would have very little.

---

**47.** Neither would his subsequent *unopposed* re-election.

**48.** "However, should plaintiff choose to offer evidence of unresponsiveness, then the defend-

ant could offer rebuttal evidence of its responsiveness." 1982 Senate Report at 19 n. 116, U.S.Code Cong. & Admin.News 1982, p. 207, n. 116.

The district court discussed responsiveness extensively, and concluded that there was no "substantial lack of responsiveness". This conclusion would not weigh heavily against a finding of dilution, and in any event it is not borne out by the evidence. The record shows that the governing authorities—especially the School Board and the Board of Registrars [49]—were considerably less responsive to black interests than one would expect them to be, if blacks had equal access to the political process. The failure of the registrar to meet its statutory duties and affirmatively to facilitate black registration has been described. The School Board has been intransigent in its opposition to integration of both students and faculty. 469 F.Supp. at 1169–71. The district court noted that the "main objective of the County Board appears to the Court to be to make the system as palatable to whites" [sic]. 469 F.Supp. at 1170. The court's 1978 opinion in the desegregation case reveals the Board's continuing hostility toward integration, to the extent that the Board was still attempting to keep school bus routes segregated. *Lee v. Marengo County Board of Education*, 454 F.Supp. at 937. Still, the district court did not find the School Board "unresponsive" because it did not "feel that any unresponsiveness to black needs has had a serious impact on equal educational opportunities", 469 F.Supp. at 1170. The court stated further that the only unresponsiveness shown was unresponsiveness "to the efforts of the United States Department of Justice", *id.* at 1179, whose "facially neutral desegregation policy ... in many respects receives no greater support in the black community than it does in the white community", *id.* at 1170.

These conclusions cannot stand. The massive differentials between black and white educational and literacy levels are irrefutable evidence of the effects of the segregated school system on generations of Marengo County's black citizens. The notion that black children might prefer segregated schools, faculties, and bus routes has been rejected since *Brown v. Board of Education*. The court's emphasis on the present equality of education in the schools is misplaced. The Voting Rights Act is concerned with *political* responsiveness. While the Board may finally be providing equal education it has done so only after three decades of resistance, and only because the courts ordered it to do so. Such a Board can hardly be considered "responsive" to the interests of blacks in participating in the affairs of the school system as political equals rather than courtroom adversaries.

The County Commission has a better record. The plaintiffs did not make a strong showing of functional unresponsiveness, but the functions of a county commission, in general, "do not easily lend themselves to unresponsive representation". *Zimmer*, 485 F.2d at 1306 n. 26. The district court did not discuss the *political* responsiveness of the commission. The best evidence of this is the racially polarized voting patterns. Responsiveness is an inherently subjective factor and the best judges are the people themselves. The continuing pattern of polarization is therefore strong evidence that the elected officials are not meeting the political needs of Marengo County blacks. *See NAACP v. Gadsden County*, 691 F.2d at 983.

The district court's findings on unresponsiveness are clearly erroneous. We find solid evidence of unresponsiveness on the part of the School Board and the Registrars. The evidence as to the County Commission does not appreciably strengthen the plaintiffs' case, but it does not harm it either. To the extent that the evidence on unresponsiveness is relevant, it weighs in favor of a finding of dilution.

---

**49.** Although the composition of the Board of Registrars is not challenged in this litigation, the Board's unresponsiveness to black needs is important because the Board is directly responsible for voter registration. Its unresponsiveness contributes significantly to the inability of blacks to participate equally in the political process.

## C.

 The ultimate conclusion under section 2, as under *Zimmer,* is "based on the totality of circumstances". 42 U.S.C.A. § 1973(b) (West Supp.1983). No formula for aggregating the factors applies in every case. Some authorities suggest that a finding of discriminatory result is compelled when the plaintiffs show racially polarized voting combined with an absence of minority elected officials. *See NAACP v. Gadsden County,* 691 F.2d at 982–83; Note, *The Constitutional Significance of the Discriminatory Effects of At-Large Elections,* 91 Yale L.J. 974, 998 (1982). Others have argued that discriminatory effect is irrebutably established when these factors are combined with a history of discrimination and present socioeconomic disparities between the races. *See Blacks United for Lasting Leadership, Inc. v. City of Shreveport,* 5 Cir.1978, 571 F.2d 248, 257 (Wisdom, J., dissenting); Hartman, 50 Geo.Wash.L.Rev. at 729–32. Certainly, when the plaintiffs establish these factors and no other factors weigh strongly against the plaintiffs' case, dilution must be found.

In this case the district court found that "apathy", not the at-large election system, was responsible for the lack of black success at the polls. This explanation is unsupported by the evidence and the controlling law. The evidence reveals racially polarized voting; a nearly complete absence of black elected officials; a history of pervasive racial discrimination that has left Marengo County blacks economically, educationally, socially, and politically disadvantaged; polling practices that have impaired the ability of blacks to register and participate actively in the electoral process; election features that enhance the opportunity for dilution; and considerable unresponsiveness on the part of some public bodies.

Some of the factors are neutral, but nothing substantial weighs in favor of the defendants. The record compels a finding that, as of the time of trial, Marengo County's at-large system resulted in an abridgement of black citizens' opportunity to participate in the political process and to elect representatives of their choice.

## VI.

 We hold that the record shows a clear violation of the results test adopted by Congress in section 2 of the Voting Rights Act. The government urges us to render judgment and remand for the devising of a remedy. We must, however, consider the convoluted procedural course this case has taken. It has been more than five years since this case was tried. The ultimate legal theory of the plaintiffs' case has changed, from "intent" to "results", although the same evidence is relevant to both theories. Conditions may have changed in Marengo County, and to devise an appropriate remedy the district court will need to evaluate conditions now rather than the conditions prevailing in 1978.

We note, however, that despite our repeated requests at oral argument, counsel for the defendants did not provide this Court with any sign that would indicate that the political opportunities for Marengo County blacks have improved since 1978.[50] We do not, by our remand, intend that this case experience more of the procedural delays that have plagued it in the past. Accordingly, on remand we suggest to the district court that it not conduct a retrial of any issues already tried and reviewed by this Court. The purpose of the remand is to allow the parties to update the record and to supplement the record with evidence that might tend to affect our finding of discriminatory results. In view of the evi-

---

50. In fact, it appears that the numerical strength of the black vote has continued to decline. In the 1980 census, Marengo County had a total population of 25,047. Of this number 13,346 (53.2%) were black and 11,663 (46.6%) were white. Of a total voting age population of 16,-534, 8,460 (51.2%) were white and 8,045 (48.7%) were black. U.S. Bureau of the Census, *General Population Characteristics, Alabama* p. 2–144, Table 45 (1980).

dence already in the record, the defendants bear the burden of establishing that circumstances have changed sufficiently to make our finding of discriminatory results in 1978 inapplicable in 1984. The district court shall entertain any evidence, conduct a hearing if necessary, and render new findings, under section 2, within a reasonably prompt time from issuance of our mandate. If a continuing violation is found, the court, of course, will devise an appropriate remedy, bearing in mind the date of the 1984 elections.

We VACATE the district court's finding that the plaintiffs did not establish discriminatory intent.[51] We REVERSE the district court's judgment insofar as it holds that Marengo County's at-large election system did not have a discriminatory result as of the time of trial. We REMAND for further proceedings in accordance with this opinion.