[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14443
_____

D.C. Docket No. 2:16-cv-00731-WKW-CSC


ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF COLORED PEOPLE,
SHERMAN NORFLEET,
CLARENCE MUHAMMAD,
CURTIS TRAVIS,
JOHN HARRIS,

Plaintiffs-Appellees,

versus

STATE OF ALABAMA,
SECRETARY OF STATE FOR THE STATE OF ALABAMA,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(February 3, 2020)

Before WILSON and BRANCH, Circuit Judges, and VINSON,[*] District Judge.

WILSON, Circuit Judge:

The Voting Rights Act (VRA) is widely considered to be among the most effective civil rights statutes ever passed by Congress.[1]  Its success is largely due to the work of private litigants.  For more than fifty years, private parties have sued states and localities under the VRA to enforce the substantive guarantees of the Civil War Amendments.  Today, private parties remain the primary enforcers of § 2 of the VRA,[2] which prohibits states from imposing election practices that result in racial discrimination.  In this appeal, Alabama argues that states are immune from these suits.  The district court—like every circuit to decide this question— rejected that argument, holding that Congress abrogated state sovereign immunity in the VRA.  After careful review of the statutory text, and with the benefit of oral argument, we affirm.

---

[*] Honorable C. Roger Vinson, Senior United States District Judge for the Northern District of Florida, sitting by designation.

[1] Before the VRA, litigators seeking to stem discriminatory practices in voting typically had to challenge those practices under the Fourteenth and Fifteenth Amendments.  This method of case-by-case litigation was ineffective in most jurisdictions given many states' resistance to change. Eventually, Congress recognized that it needed a more robust regime to fulfill the guarantees of the Civil War Amendments.  The VRA was the solution, achieving unprecedented success in minority voter registration and turnout.

[2] The Department of Justice has filed only 4 of the 61 enforcement actions under § 2 since 2013. *See* U.S. Civil Rights Commission, *An Assessment of Minority Voting Rights Access in the United States* 10 (2018).

I.

We review issues of federal subject matter jurisdiction and sovereign immunity de novo. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1333–34 (11th Cir. 1999). A district court's denial of a motion to dismiss on sovereign immunity grounds is immediately appealable. *Id*. at 1334. We therefore have jurisdiction to resolve Alabama's sovereign immunity claim in this interlocutory appeal.[3]

The Eleventh Amendment, as interpreted by the Supreme Court, generally prohibits suits against a state by its own citizens in federal court. *See Hans v. Louisiana*, 134 U.S. 1, 10–15 (1890). But state sovereign immunity is not absolute. In *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), the Supreme Court explained that Congress can abrogate state sovereign immunity pursuant to its Fourteenth Amendment enforcement powers to redress discriminatory state action. Recognizing that the Civil War Amendments intentionally changed the balance of power between the federal government and the States, the Court affirmed that those amendments permitted Congress to intrude "into the judicial, executive, and legislative spheres of autonomy previously reserved to the States." *Id.* at 455.

---

[3] The Appellees suggest that the issue of whether Alabama has sovereign immunity from suit is moot because the trial on the underlying § 2 claim is over. After supplemental briefing on this issue, we disagree. The trial may be over, but Alabama must defend itself in ongoing post-trial proceedings. Alabama thus faces a harm that we can redress.

3

To determine whether Congress abrogated state sovereign immunity, we ask whether Congress (1) expressed its unequivocal intent to do so and (2) acted "pursuant to a valid grant of constitutional authority." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (internal quotation marks omitted).

## II.

Under the first prong, Congress must make its intention to abrogate sovereign immunity "unmistakably clear in the language of the statute." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985). The expression of Congress's intent must be textual; legislative history is not proper evidence of abrogation. *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989). But an express abrogation clause is not required. Instead, a court may look to the entire statute, and its amendments, to determine whether Congress clearly abrogated sovereign immunity. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 76 (2000) ("[O]ur cases have never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) (reading the Indian Gaming Regulatory Act (IGRA) as a whole and concluding that Congress's intent to abrogate was unmistakably clear, although ultimately holding that Congress had not acted pursuant to a valid grant of authority).

4

The Supreme Court's cases addressing abrogation are instructive here. In *Atascadero*, the Court held that the Rehabilitation Act of 1973—which provided remedies against "any recipient of Federal assistance" but did not explicitly refer to the States—contained only a general authorization for suit in federal court and was "not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." 473 U.S. at 245–46. The Court concluded that, given the States' unique constitutional role, "[w]hen Congress chooses to subject the States to federal jurisdiction, it must do so *specifically*." *Id.* at 246 (emphasis added). Likewise, in *Welch v. Texas*, the Court held that the Jones Act, which extended remedies to "any seaman who shall suffer personal injury in the course of his employment," contained only a general authorization for suit and lacked an expression of congressional intent to abrogate sovereign immunity. 483 U.S. 468, 475–76 (1987) (alteration accepted) (emphasis omitted).

Similarly, the Court in *Dellmuth* acknowledged that the references to the States in the Education of the Handicapped Act (EHA) made them "logical defendants" under the Act, but held that such a "permissible inference" did not amount to an unequivocal declaration abrogating sovereign immunity. 491 U.S. at 232. In particular, the Court explained that the EHA's judicial review provision allowed aggrieved parties to "bring a civil action . . . in any State court of

5

competent jurisdiction or in a district court of the United States," but did not indicate that the States were subject to suit.  *Id.* at 228, 231.

In contrast, the Court in *Kimel* held that the Age Discrimination in Employment Act (ADEA) made Congress's intent to abrogate state sovereign immunity unmistakably clear.  528 U.S. at 67–68.  The Court relied on the ADEA's language that an individual may bring a civil action "against any employer (including a public agency)" and that a "public agency" includes "the government of a State or political subdivision thereof."  *Id.*; *see also Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) (holding that Congress made clear its intent to abrogate sovereign immunity in the Family Medical Leave Act (FMLA) by using similar language).

And, finally, in *Seminole Tribe*, the Court held that Congress clearly expressed its intent to abrogate state sovereign immunity in the IGRA.  517 U.S. at 57.  The Court noted that the IGRA gives the United States district courts "jurisdiction over . . . any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe" and provides a detailed remedial scheme for such a failure.  *Id.* at 49–50.  For example, the IGRA states that the burden of proof shifts to the State if a suing tribe meets its burden of proof, and it provides guidance for the State and the tribe to submit claims to mediation if a compact cannot be reached.  *Id.* at 50.  Thus, the Court concluded

6

that "the numerous references to the 'State' in the text of the [IGRA] ma[d]e it indubitable that Congress intended . . . to abrogate the States' sovereign immunity from suit." *Id.* at 57.

With that background, we turn to the text of the VRA. Section 2 of the VRA, as amended over the years, prohibits "any State or political subdivision" from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race." 52 U.S.C. § 10301(a). Section 3 of the VRA provides the general enforcement mechanisms of the Act. *See* 52 U.S.C. § 10302. Originally, § 3 gave enforcement authority only to the Attorney General of the United States. Shortly after it was passed, the Supreme Court recognized an implied private right of action in the VRA consistent with the purposes of the Act. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 549 (1969). Congress then amended § 3 in 1975 to make what was once implied now explicit: private parties can sue to enforce the VRA. Section 3, entitled "Proceeding to enforce the right to vote," now sets forth the appropriate judicial procedures for whenever "the Attorney General *or an aggrieved person*" institutes a proceeding "to enforce the voting guarantees of the [F]ourteenth and [F]ifteenth [A]mendment in any State or political subdivision." 52 U.S.C. § 10302(a), (b), and (c).

7

Against this backdrop, both the Fifth and Sixth Circuits—the only other circuits that have considered this issue—held that Congress validly abrogated state sovereignty in the VRA. *See Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999) (holding that Congress intended to abrogate the States' sovereign immunity under the VRA because it "specifically prohibits 'any State or political subdivision' from discriminating against voters on the basis of race"); *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (holding that the VRA validly abrogated state sovereign immunity and citing to *Mixon*). Similarly, two separate panels of three-judge district courts, each hearing claims under the VRA, reached the same conclusion. *See Ga. State Conference of NAACP v. State*, 269 F. Supp. 3d 1266, 1274−75 (N.D. Ga. 2017) (holding that § 2 of the VRA "'unequivocally expresses' an intent to abrogate state sovereign immunity," as it "specifically forbids 'any State or political subdivision' from discriminating against voters" based on race (alteration accepted)); *Reaves v. U.S. Dep't of Justice*, 355 F. Supp. 2d 510, 515−16 (D.D.C. 2005) (per curiam) (describing South Carolina's assertion of sovereign immunity under the VRA as "without merit").

Today we agree with both of our sister circuits and the district court in this case, which concluded that it was "difficult to conceive of any reasonable interpretation of Section 2 that does not involve abrogation of the state's immunity." The VRA, as amended, clearly expresses an intent to allow private

8

parties to sue the States.  The language of § 2 and § 3, read together, imposes direct liability on States for discrimination in voting and explicitly provides remedies to private parties to address violations under the statute.  Unlike the general authorizations in the statutes at issue in *Atascadero* and *Welch*, § 2 *specifically* forbids "any *State*" from imposing a practice that would deny any citizen the right to vote on account of race.  52 U.S.C. § 10301 (emphasis added); *see Atascadero*, 473 U.S. at 246; *Welch*, 483 U.S. at 476.  And § 3 repeatedly refers to proceedings initiated by "the Attorney General *or an aggrieved person*" to enforce § 2 or other provisions of the VRA.  52 U.S.C. § 10302(a), (b), and (c).  Thus, read as a whole, the VRA makes it clear that Congress intended to permit "aggrieved person[s]" to bring proceedings against "any State or political subdivision."[4]  Indeed, like the statute at issue in *Seminole Tribe*, the VRA is a carefully designed remedial statute—one that is predicated upon suits against States.  *See* 517 U.S. at 57.  It is implausible that Congress designed a statute that primarily prohibits certain state

---

[4] The dissent states that our interpretation places too much emphasis on the VRA's mention of the word "State" and ignores *Seminole Tribe*'s instruction to look at the entirety of the language of the statute.  *See* Dissenting Op. at 6–7.  Yet as stated above, our interpretation is based on reading the statute as a whole, rather than reading § 2 and § 3 in isolation from one another.  Specifically, it is the VRA's clear and textual prohibition against certain conduct by "any State or political subdivision," combined with its repeated reference to proceedings instituted by "the Attorney General or an aggrieved person" that makes it "both unequivocal and textual" that Congress intended to abrogate state sovereign immunity and permit aggrieved persons to institute proceedings against any State that violates § 2 of the VRA.

conduct, made that statute enforceable by private parties, but did not intend for private parties to be able to sue States.

As the Supreme Court explained years after Congress amended the VRA to allow private rights of action, Congress "recognized that private rights of action" were available under the VRA when it "reenacted and extended the life of the Voting Rights Act in 1975." *Morse v Republican Party of Va.*, 517 U.S. 186, 233 (1996).[5]  In line with this understanding, private parties have sued States and state officials under § 2 of the VRA for decades.  *See, e.g., Chisom v. Roemer,* 501 U.S. 380 (1991) (a private challenge under § 2 against the Governor and other state officials); *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) (a private challenge under § 2 against the State of Alabama).

The dissent suggests that the VRA's use of compound phrases to prohibit the conduct of both a "State or political subdivision" and to permit proceedings by both "the Attorney General or an aggrieved person" makes Congress's intent to abrogate state sovereign immunity unclear.  Dissenting Op. at 11.  That is simply not true based on the language of the statute, which clearly indicates that both the

---

[5] Justice Stevens's opinion for the court, Justice Breyer's concurring opinion, and Justice Thomas's dissenting opinion in *Morse* all recognized that the amended § 3 gave a right of action to private parties.  *Morse*, 517 U.S. at 233; *see also id*. at 240 (Breyer, J., concurring) (recognizing that, through the amended § 3, Congress gave "a private right of action to enforce § 10 [of the VRA], no less than it did to enforce §§ 2 and 5"); *id*. at 289 (Thomas, J., dissenting) ("As appellants accurately state, § 3 explicitly recognizes that private individuals can sue under the Act." (alteration accepted) (internal quotation marks omitted)).

Attorney General and aggrieved persons may institute proceedings against a State or a political subdivision.  The dissent cites *Dellmuth* in support of its position that the "aggrieved person" language, alone, is insufficient to abrogate sovereign immunity.  *Id.* at 11–12.  But the "aggrieved parties" language in *Dellmuth* appeared in an enforcement provision that merely stated that parties could bring suit in State court or in a United States district court.  *Dellmuth*, 491 U.S. at 231.  In contrast, § 2 of the VRA *specifically* applies to "any State or political subdivision," and the enforcement provision then refers to suits to enforce the statute by aggrieved persons.  Moreover, the dissent does not dispute that the VRA subjects the States to suit; rather, it argues that the States are only subject to suits by the Attorney General, and aggrieved persons may only sue a political subdivision—an interpretation that takes at least one too many creative leaps from the text of the statute.  Dissenting Op. at 8, 11–12.

Alabama's arguments to the contrary are equally unpersuasive.  Alabama first argues that § 3's language allowing private parties to seek a remedy in "a proceeding under any statute to enforce the voting guarantees of the [F]ourteenth or [F]ifteenth [A]mendment" does not include suits brought under the VRA. Alabama argues this 1975 amendment to the VRA is best read to apply to *other* federal statutes that might seek to enforce the voting guarantees of the Fourteenth

11

and Fifteenth Amendments, but not those suits seeking to enforce the VRA itself.[6]

This reading is contrary to both the text of the statute and Supreme Court

precedent. *See Morse*, 517 U.S. at 233 (explaining that the 1975 amendments to

the VRA recognized that private rights of action were available to enforce the

VRA); *see also id*. at 289 (Thomas, J., dissenting) ("As appellants accurately state,

§ 3 *explicitly* recognizes that private individuals can sue *under the [Act]*."

(emphasis added) (internal quotation marks omitted)).

Alabama also argues that interpreting the VRA to preclude abrogation of

sovereign immunity would not render the statute meaningless because private

parties could still sue local governments under the Act.  This is true.  But the same

thing could be said of many statutes in which the Supreme Court found that

Congress clearly intended to abrogate immunity.  Both the FMLA and the

ADEA—the statutes at issue in *Hibbs* and *Kimel*—permitted private parties to sue

local governments in addition to States, and thus both statutes would have

remained operative even without a finding of abrogation.

---

[6] Alabama argues that Congress would have said that suits can be brought under "*this* statute" instead of "*any* statute" if it intended to provide a private right of action under the VRA.  But the VRA is, by definition, "any" such statute—it is designed to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments.  *See United States v. Bd. of Comm'rs of Sheffield, Ala*., 435 U.S. 110, 126–27 (1978) (explaining that the VRA was designed to implement the guarantees of both amendments); *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1550 (11th Cir. 1984) (holding that "Section 2 [of the VRA] is a constitutional exercise of congressional enforcement power under the Fourteenth and Fifteenth Amendments").

We do not read any of the Supreme Court's precedent, or our own, to require that a statute be utterly meaningless without a finding of abrogation before a court can find congressional intent to abrogate immunity. We instead ask whether the statute's text makes clear that Congress intended to subject States to liability by private parties. The answer here is unmistakably yes.

III.

In order to abrogate state sovereign immunity, Congress must also act pursuant to a valid grant of power. *See Garrett*, 531 U.S. at 363. While Congress may not abrogate a State's immunity when acting pursuant to its Article I powers, it may do so under its enforcement powers pursuant to § 5 of the Fourteenth Amendment. *See id*. at 364; *see also Fitzpatrick*, 427 U.S. at 456 ("[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment."). The Supreme Court has never considered whether Congress may abrogate state sovereign immunity using its Fifteenth Amendment enforcement powers.

The VRA was designed "to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment." *Bd. of Comm'rs of Sheffield*, 435 U.S. at 126–27; *see also Marengo*, 731 F.2d at 1556 ("Congress [in enacting Section 2] . . . relied not on any independent power to interpret the Constitution but

13

rather on congressional power to enforce the Civil War Amendments."). As the Supreme Court has repeatedly recognized, the Civil War Amendments allow Congress to intrude "into the judicial, executive, and legislative spheres of autonomy previously reserved to the States." *Fitzpatrick*, 427 U.S. at 455; *see also City of Rome v. United States*, 446 U.S. 156, 179 (1980) (explaining that the Civil War Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty"), *abrogated on other grounds by Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013). Given this design, "principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation.'" *City of Rome*, 446 U.S. at 179.

Both § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment, using identical language, authorize Congress to enforce their respective provisions by appropriate legislation. The Supreme Court has often referred to these enforcement provisions in tandem, describing them as "parallel" powers to enforce the Civil Rights Amendments. *See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997). We agree with the Fifth and Sixth Circuits that if § 5 of the Fourteenth Amendment permits Congress to abrogate state sovereign immunity, so too must § 2 of the Fifteenth Amendment. *See Mixon*, 193 F.3d at 399; *OCA-Greater Houston,* 867 F.3d at 614. The nature of the Civil War Amendments as an

14

intentional intrusion on state sovereignty and the identical enforcement provisions of both Amendments allow for no other conclusion.

By design, the VRA was intended to intrude on state sovereignty to eradicate state-sponsored racial discrimination in voting.[7]  Because the Fifteenth Amendment permits this intrusion, Alabama is not immune from suit under § 2 of the VRA.  Nor is § 2 any great indignity to the State.  Indeed, "it is a small thing and not a great intrusion into state autonomy to require the [S]tates to live up to their obligation to avoid discriminatory practices in the election process." *Marengo*, 731 F.2d at 1561.

**AFFIRMED.**

---

[7] In this appeal, Alabama suggests that we should reconsider the constitutionality of § 2.  But § 2's constitutionality has been conclusively resolved in precedent binding on this Court.  *See Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) (summarily affirming a district court panel's holding that the amended § 2 is a valid exercise of congressional power); *Marengo*, 731 F.2d at 1550 ("We now hold that . . . amended section 2 is a constitutional exercise of congressional enforcement power under the Fourteenth and Fifteenth Amendments.").  Fifteen years later, and post-*City of Boerne*, we explained that any challenge to the constitutionality of § 2 is "foreclosed" by *Marengo*.  *See Johnson v. Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999).  *Shelby County* does not change this analysis.  We take Chief Justice Roberts at his word when he explained that the Court's decision in *Shelby County* "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2."  570 U.S. at 557.

BRANCH, Circuit Judge, dissenting:

Because I find that Congress did not unequivocally abrogate state sovereign immunity under Section 2 of the Voting Rights Act ("VRA"), I respectfully dissent from the majority opinion.

The Eleventh Amendment to the United States Constitution provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  By now, it is well settled that "the Eleventh Amendment's ultimate guarantee is that nonconsenting states may not be sued by private individuals in federal court."  *See McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001).  "The Amendment not only bars suits against a state by citizens of another state, but also applies equally to suits against a state initiated by that state's own citizens."  *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974); *Hans v. Louisiana,* 134 U.S. 1, 13–15 (1890)).

The Supreme Court has nonetheless recognized that Congress may abrogate state sovereign immunity provided certain requirements are met.[1]  Determining

---

[1] States may also be sued in federal court if they consent to it in unequivocal terms.

whether Congress has validly abrogated state sovereign immunity requires us to "resolve two predicate questions: first, whether Congress *unequivocally* expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) (emphasis added).[2]

The Supreme Court has, time and again, repeated the "simple but stringent test" we use to answer the first question: "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention *unmistakably clear in the language of the statute*." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (emphasis added)). This Circuit has taken *Dellmuth*'s "clear statement rule" to heart: "[A] federal statute will not be read to abrogate a state's sovereign immunity unless Congress has made its intention to do so 'unmistakably

---

*Green v. Mansour*, 474 U.S. 64, 68 (1985) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)). The State of Alabama notes that it has not consented to this suit. The Alabama Constitution provides that "the State of Alabama shall never be made a defendant in any court of law or equity," Ala. Const. art. I, § 14, and this provision has been interpreted by the Alabama Supreme Court to prohibit Alabama from consenting to suit. *Aland v. Graham*, 250 So. 2d 677, 681 (Ala. 1971) (Section 14 "wholly withdraws from the Legislature, or any other state authority, the power to give consent to a suit against the state" (quoting *Dunn Constr. Co. v. State Bd. of Adjustment*, 175 So. 3d 383, 386 (Ala. 1937))). The plaintiffs have not argued that the State has consented, and the district court did not reach this issue. Accordingly, it is not before us. The only question we face is whether Congress has validly abrogated Alabama's sovereign immunity through Section 2 of the VRA.

[2] In applying *Kimel* to this case, I ultimately find the answer to *Kimel*'s first question to be "no." Thus, I do not consider the second predicate question posed by *Kimel* or the majority's analysis of "whether Congress acted pursuant to a valid grant of constitutional authority." *Kimel*, 528 U.S. at 73.

clear' in the language of the statute." *Cassady v. Hall*, 892 F.3d 1150, 1153 (11th

Cir. 2018) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985).

Because Section 2 of the VRA is at issue in this case, I begin with its text:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(a)–(b).

The text of Section 2 is straightforward: It forbids "any State or political

subdivision" from imposing any "voting qualification or prerequisite to voting or

standard, practice, or procedure . . . which results in a denial or abridgement of the

right of any citizen of the United States to vote on account of race or color." *Id.*

§ 10301(a). But Section 2 does not include any language that demonstrates

unmistakably clear congressional intent to abrogate state sovereign immunity. It

18

clearly contains no express reference to either the Eleventh Amendment or state sovereign immunity.  Moreover, the text of Section 2 contains no language whatsoever—either explicitly or by implication—that allows private plaintiffs to sue a State in federal court.  *See, e.g., Cassady*, 892 F.3d at 1154 (a Georgia statute that "says nothing about the federal courts . . . does not indicate that it waives the State's immunity in federal court").  Because "evidence of congressional intent must be both *unequivocal and textual*" in order to support a finding of abrogation, *Dellmuth*, 491 U.S. at 230 (emphasis added), the absence of such language is fatal.

The majority is, of course, correct that Congress need not use the words "abrogation" or "state sovereign immunity."  *See Dellmuth*, 491 U.S. at 233 (Scalia, J., concurring) (noting that such express language is not required).  And the majority is correct that the Supreme Court has found express abrogation of state sovereign immunity in other federal statutes when such clear language is not used.  But Section 2's text is unlike the text of those other statutes.  For example, as noted by the majority, in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Supreme Court found that the Indian Gaming Regulatory Act ("IGRA") clearly abrogated state sovereign immunity because the structure of the IGRA "authorize[d] a tribe to bring suit in federal court against a State," *id*. at 47, and the statute provided an "unmistakably clear" statement of intent that the State was to be a defendant against suits filed under the statute:

19

> Any conceivable doubt as to the identity of the defendant in an action under [the statute] is dispelled when one looks to the various provisions of . . . the remedial scheme available to a tribe that files suit under [the statute].  Section 2710(d)(7)(B)(ii)(II) provides that if a suing tribe meets its burden of proof, then the "burden of proof shall be upon the State . . ."; § 2710(d)(7)(B)(iii) states that if the court "finds that the State has failed to negotiate in good faith . . ., the court shall order the State . . ."; § 2710(d)(7)(B)(iv) provides that "the State shall . . . submit to a mediator appointed by the court" and subsection (B)(v) of § 2710(d)(7) states that the mediator "shall submit to the State."  Sections 2710(d)(7)(B)(vi) and (vii) also refer to the "State" in a context that makes it clear that the State is the defendant to the suit brought by an Indian tribe under § 2710(d)(7)(A)(i).  In sum, we think that the numerous references to the "State" in the text of § 2710(d)(7)(B) make it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit.

*Id.* at 56–57.  The IGRA expressly abrogated state sovereign immunity because it specifically contemplated—that is, the *language of the statute explicitly provided for*—the State as the defendant in a federal suit brought under that statute.

*Seminole Tribe*, 517 U.S. at 57.[3]

---

[3] The majority also cites to two other cases where the Supreme Court has found express abrogation of state sovereign immunity: *Kimel*, 528 U.S. 62 and *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721 (2003).  But the statutes at issue in *Kimel* and *Hibbs* are easily distinguishable from the text of Section 2.

In *Kimel*, the Supreme Court considered the text of the Age Discrimination in Employment Act of 1967 (ADEA), which made it unlawful for an employer—including a State—to discriminate on the basis of age.  528 U.S. at 67.  The ADEA contained a provision that authorized "employees to maintain actions for backpay 'against any employer (including a public agency) in any Federal or State court of competent jurisdiction. . . .'"  *Id.* at 73–74 (citations omitted).  The ADEA further defined "public agency" to include "*the government of a State* or political subdivision thereof, and any agency of . . . a State, or a political subdivision of a State."  *Id.* at 74.  Thus, the Supreme Court concluded that "the plain language of [the ADEA] clearly demonstrates Congress' intent to subject the States to suit for money damages at the hands of individual employees."  *Id.*

Similarly, in *Hibbs*, the Supreme Court considered the text of the Family and Medical Leave Act ("FMLA"), which: (1) "enable[d] employees to seek damages 'against any employer

20

In contrast to the IGRA, the language of Section 2 does not demonstrate that "Congress intended through the Act to abrogate the States' sovereign immunity from suit." *Id.* Section 2 contains no express authorization enabling individuals to maintain such an action in federal court against a State. Section 2 does not "refer to the 'State' in a context that makes it clear that the State is the defendant to the suit brought by" private plaintiffs in federal court. *Id.* Put simply, Section 2 lacks any language that would "make it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit." *Id.*; *see also Atascadero*, 473 U.S. at 243 ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment.").

The majority incorrectly focuses on one point made by the Court in *Seminole Tribe* in deciding that the IGRA abrogated state sovereign immunity: "the numerous references to the 'State' in the text of [the statute]." *Seminole*

---

(including a public agency) in any Federal or State court of competent jurisdiction,'" and (2) defined "public agency" to include "*the government of a State* or political subdivision thereof and any agency of . . . a State, or a political subdivision of a State." 538 U.S. at 726 (citations omitted). By explicitly authorizing individuals to sue the State, "[t]he clarity of Congress' intent [was] not fairly debatable." *Id.* As such, the FMLA "satisfied the clear statement rule of *Dellmuth*" in abrogating state sovereign immunity. *Id.*

Section 2, however, lacks language that clearly identifies the State as a proper defendant in a federal lawsuit brought by private individuals. So, unlike the statutes considered in *Kimmel* and *Hibbs*, Section 2 lacks "plain language" that "clearly demonstrates Congress' intent to subject the States to suit[.]" *Kimel*, 528 U.S. at 74. Accordingly, Section 2 has not "satisfied the clear statement rule of *Dellmuth*." *Hibbs*, 538 U.S. at 726.

21

*Tribe*, 517 U.S. at 57.  In so doing, however, the majority misses the broader point articulated by *Seminole Tribe*: courts must look to the entirety of the language of the statute. It is not dispositive that the word "State" is mentioned, nor that it is mentioned multiple times.  In fact, the Supreme Court rejected a similar argument in *Dellmuth*, holding that although the statute in question contained "frequent reference to the States" and it could be inferred that the States were intended to be subject to liability, "such a permissible inference, whatever its logical force, would remain just that: a permissible inference . . . [and was] not . . . the unequivocal declaration which .  . . is necessary before [a court] will determine that Congress intended to exercise its powers of abrogation."  491 U.S. at 232.

The majority finds abrogation because it is "difficult to conceive of any reasonable interpretation of Section 2 that does not involve abrogation of the state's immunity" and to find otherwise would make Congress's actions "implausible." *See* Maj. Op. at 8.  By doing so, the majority rests on an erroneous assumption that "a legislature never adopts half-way measures, never attacks the easy part of the problem without attacking the more sensitive part as well." *Morse v. Republican Party of Virginia*, 517 U.S. 186, 246 (1996) (Scalia, J., dissenting); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 123 (1984) ("[C]onsiderations of policy cannot override the constitutional limitation on the

22

authority of the federal judiciary to adjudicate suits against a state"). [4]  And, importantly, Section 2 prohibits conduct by a party other than a State; it *also* prohibits conduct of a "political subdivision."  52 U.S.C. § 10301(a)–(b); Black's Law Dictionary 1197 (8th ed. 2004) ("A division of a state that exists primarily to discharge some function of local government").  Indeed, the majority acknowledges that "interpreting the VRA to preclude abrogation of sovereign immunity would not render the statute meaningless because private parties could still sue local governments under the Act."  *See* Maj. Op. at 12.  So—based on the text of Section 2—it is *entirely* plausible that Congress "made that statute enforceable by private parties, but did not intend for private parties to be able to sue the States."  *See id*. at 10.

To support its conclusion that Section 2 of the VRA abrogates state sovereign immunity, the majority finds that Section 2 and Section 3 when "read together" make it clear that Congress intended to "permit 'aggrieved person[s]' to

---

[4] In reality, "[s]tatutes rarely embrace every possible measure that would further their general aims[.]"  *Return Mail, Inc. v. U.S. Postal Serv*., 139 S. Ct. 1853, 1867 n.11 (2019) (holding that, "absent other contextual indicators of Congress' intent to include the Government in a statutory provision referring to a 'person,'" the government is not a "person" capable of instituting administrative review proceedings).  It is not the role of this Court "to engraft on a statute additions which we think the legislature logically might or should have made."  *Id.* (quoting *United States v. Cooper Corp*., 312 U.S. 600, 605 (1941)).  Interestingly, in *Return Mail*, the Supreme Court cited a statute that very clearly provides "that States 'shall not be immune . . . from suit in Federal court by any person, including any governmental or nongovernmental entity. . . .'"  *Id.* at 1863 n.3 (citation omitted).  While such language is not required, *Return Mail* further illustrates that Congress knows how to abrogate state sovereign immunity expressly.

23

bring proceedings against 'any State or political subdivision.'" *See id.* at 9

(alterations in original). But neither Section 2 or Section 3 on their own, nor

combined, is unmistakably clear in its language that Congress intended to abrogate

States' sovereign immunity. Because the majority also turns to Section 3 of the

VRA, so do I.[5]

Section 3 provides as follows:

**(a) Authorization by court for appointment of Federal observers**

*Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision* the court shall authorize the appointment of Federal observers . . . to serve for such period of time and for such political subdivisions as the court shall determine is appropriate to enforce the voting guarantees of the fourteenth or fifteenth amendment (1) as part of any interlocutory order if the court determines that the appointment of

---

[5] In its discussion of Section 3, the majority states that "private parties have sued States and state officials under § 2 of the VRA for decades," and cites two cases—*Chisom v. Roemer,* 501 U.S. 380 (1991), and *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015)—to support its statement. *See* Maj. Op. at 10. Both cases are inapposite as state sovereign immunity was not at issue.

*Chisom* involved black registered voters in Louisiana who filed suit under Section 2 of the VRA to challenge Louisiana's method of electing State Supreme Court justices. 501 U.S. at 384. Notably, the *Chisom* plaintiffs sued the Governor of Louisiana and other state officials, but the State of Louisiana was *not* a party to the case. And, although the State of Alabama was a defendant in *Alabama Legislative Black Caucus*, state sovereign immunity was not at issue in that case. *See Ala. Legislative Black Caucus*, 135 S. Ct. 1257.

In short, *Chisom* involved Section 2 but not the State as a defendant, while *Alabama Legislative Black Caucus* involved the State as a defendant but did not consider abrogation of state sovereign immunity. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("[T]he Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can [choose to] waive the defense. Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it." (internal citations omitted)).

24

such observers is necessary to enforce such voting guarantees or (2) as part of any final judgment if the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred in such State or subdivision: *Provided*, That the court need not authorize the appointment of observers if any incidents of denial or abridgement of the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title (1) have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

**(b) Suspension of use of tests and devices which deny or abridge the right to vote**

*If in a proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision* the court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title, it shall suspend the use of tests and devices in such State or political subdivisions as the court shall determine is appropriate and for such period as it deems necessary.

**(c) Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote**

*If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision* the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, *the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate* and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless

and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

52 U.S.C. § 10302 (a)–(c) (emphasis added).

The text of Section 3 contemplates lawsuits by the U.S. Attorney General. And when Sections 2 or 3 are violated, the U.S. Attorney General is expressly empowered to "institute for the United States, or in the name of the United States, an action" against the State under Section 12.  52 U.S.C. § 10308(d).[6] Additionally, section 3 also permits "an aggrieved person . . . to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision." But statutory authority for "aggrieved persons" to sue in federal court generally does not demonstrate that such "aggrieved persons" can sue *States* in

---

[6] "In ratifying the Constitution, the States consented to suits brought by other States or by the Federal Government." *Alden v. Maine*, 527 U.S. 706, 755 (1999) (citation omitted). But such suits are qualitatively different than suits brought by private plaintiffs and, in fact, "the fear of private suits against nonconsenting States was *the central reason* given by the Founders who chose to preserve the States' sovereign immunity." *Id.* at 756 (emphasis added).

federal court.  *Dellmuth* tells us that similar "aggrieved party" language is too

general:

> Finally, [the statutory provision that is] the centerpiece of the Court of
> Appeals' textual analysis, provides judicial review for aggrieved
> parties, but in no way intimates that the States' sovereign immunity is
> abrogated.  As we made plain in *Atascadero*: "A general authorization
> for suit in federal court is not the kind of unequivocal statutory
> language sufficient to abrogate the Eleventh Amendment."

*Dellmuth*, 491 U.S. at 231 (citing *Atascadero*, 473 U.S. at 246).  Consequently,

Section 3's "aggrieved person" language is insufficient evidence that Congress

intended to exercise its powers of abrogation.[7]

Further, Section 3 solely provides certain actions that courts of competent

jurisdiction must take once proceedings have been initiated "*in* any State or

political subdivision."  It does not authorize proceedings "against" a State or

political subdivision.  *Compare In,* WEBSTER'S THIRD NEW INTERNATIONAL

ENGLISH DICTIONARY, THE UNABRIDGED (1961) ("that is located inside or within"),

*with Against*, *id*. ("in opposition or hostility to").[8]

---

[7] The majority tries to distinguish the "aggrieved party" statutory language at issue in
*Dellmuth* with Section 3's "aggrieved person" language by noting that former was merely an
enforcement provision while the latter (when combined with Section 2) is an enforcement
provision *plus* a restriction on state behavior.  But this is a distinction without a difference; three
uses of vague language in Section 3 do not combine to provide unmistakably clear evidence of
Congress's intent to abrogate state sovereign immunity.

[8] As we explained above, *supra* n. 3, in both *Kimel* and *Hibbs* the provisions in the
ADEA and FMLA which abrogated States' sovereign immunity provided for suits *against* the
States.  *Kimel*, 528 U.S. at 73–74  (finding abrogation when the ADEA authorized "employees to
maintain actions for backpay '*against* any employer (including a public agency) in any Federal
or State court of competent jurisdiction . . . .'") (emphasis added); *Hibbs*, 538 U.S. at 726

The majority also notes that "both the Fifth and Sixth Circuits—the only other circuits that have considered this issue—held that Congress validly abrogated state sovereignty in the VRA."  I find neither decision persuasive.  In *Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999), the Sixth Circuit reached a conclusion on this issue without providing much analysis:

> With respect to whether Congress intended to abrogate the States' sovereign immunity under the Voting Rights Act, we believe the language and purpose of the statute indicate an affirmative response. The language of Section 2 of the Act, 42 U.S.C. § 1973, specifically prohibits "any State or political subdivision" from discriminating against voters on the basis of race.

*Id.* at 398.  The Fifth Circuit then embraced the Sixth Circuit's decision without further analysis, holding that "[t]he VRA, which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity," and included a footnote citing *Mixon*.  *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).  While the *Mixon* court accurately quoted the statute when it says that "[t]he language of Section 2 . . . specifically prohibits 'any State or political subdivision' from discriminating against voters on the basis of race," *id*., nothing in those five words—"any State or political subdivision"—

---

(finding abrogation when the FMLA "enable[d] employees to seek damages '*against* any employer (including a public agency) in any Federal or State court of competent jurisdiction,'") (emphasis added).

28

abrogates state sovereign immunity such that private individuals can sue the State in federal court.

It is difficult to overstate the enormously important role that the abrogation doctrine plays in our federal system. "The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity." *Alden v. Maine*, 527 U.S. 706, 715 (1999); *Atascadero*, 473 U.S. at 242 ("The 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.'" (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 572 (1985) (Powell, J., dissenting))); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997) (explaining that immunity is designed to protect "the dignity and respect afforded a State"). In its decision today, the majority erodes this constitutional principle by effectively dispensing with the express abrogation test required by the Supreme Court and replacing it with something novel and without foreseeable limitations: Congress prohibits state conduct, ergo abrogation. For the reasons set forth herein, I respectfully dissent. I would reverse the district court's order and remand with instructions to dismiss the State of Alabama from this suit.